[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this tax assessment appeal, the plaintiff contests the tax assessment imposed by the defendant's tax assessor on property of the plaintiff — a large hotel and restaurant operating under the aegis of the Howard Johnson Company, Inc., located at 402 Sargent Drive, in the "Long Wharf" section of New Haven.
The complaint sets out that the defendant City was the original owner of the parcel of land involved which, in 1963, was leased to the New Haven Food Terminal. The Food Terminal leased the property to a developer, Stanley Becker, in 1970; and Becker built the hotel building and swimming pool, which subsequently from 1971, became occupied and operated as a hotel by the Howard Johnson Company, Inc. On December 15, 1986 the Howard Johnson Company, Inc., assigned its leasehold interest to the plaintiff herein — the Northeast Hotel Associates for a consideration of $3,809,000. (Exh. H). This assignment permitted the lessee plaintiff herein, to contest the tax assessment on the property. In 1987 the plaintiff invested an additional $143,000 to complete a refurbishment of the motel. The plaintiff obtained a $3,000,000 CT Page 1565 mortgage on the subject property.
Over seven days of trial the parties adduced voluminous evidence by way of expert appraisal testimony and exhibits.
 I.
Finding of Facts
Based on the evidence adduced, the following facts are found.
1) The subject hotel was built in 1971 and is located on slightly over 2 acres of land just off Route I-95, in the Long Wharf section in the City of New Haven.
2) The parties are in accord that the 8 story hotel structure was constructed of precast concrete, and has an outdoor swimming pool of approximately 18 X 33 and 7 X 10 feet, to the rear of the hotel itself.
3) It is located in a Business A zone, and complies with existing zoning regulations in which the highest and best use is for a motel, the business conducted on the subject property.
4) The subject property contains a land area of 95,877 square feet with improvements thereon, covering 80,982 square feet.
5) The plaintiff's appraiser Clyde, in his report, in evidence as Exhibit A, admits (p. 10) that "the subject is attractive, well laid out, well maintained," and in his opinion, still has "a reasonable remaining economic life of 35 years."
6) Both plaintiff's appraiser, Clyde, and the defendants' appraiser, A. Robert Parente, of New Haven, agreed that the best approach to obtaining a fair market valuation of the subject property would be by an "Income Capitalization Approach."
7) Clyde also arrived at a fair market valuation by utilizing a "Sales Approach To Value", based on three sales he believed to be comparable to the subject parcel.
8) Clyde, however, did not use a "Reproduction Cost Approach" because, in his opinion, it was not adaptable to this case.
9) Defendant's appraiser, Parente, did calculate a "Reproduction Cost" valuation because, in his opinion, "the subject improvements are of recent construction and well maintained." (Parente Report (Ex. 9, p. 11).
10) Parente's Report (Exh. 9) states (p. 12) that "The Income CT Page 1566 Capitalization Approach was given primary reliance, with the Reproduction Cost Approach as a check."
11) He did not, however, develop a "Sales Comparison Approach" "because of the paucity of sales which reasonably resemble the appraised property in location, size, design and modernity."
12) In his original Report, Ex. A, page 18, appraiser Chase, using an "Income Valuation Approach" to calculate a market value for the year 1978, determined that the "Income Attributed to Real Property Before Real Estate Tax" was $215,447.
13) He, thereupon, divided the $215,447 by an "Overall Capitalization" rate of .1631%, which he arrived at (p. 18 of Clyde Report — Exh. A), by the following formula (Exh. A., p. 18) and reached an "Indicated Value" of $1,320,000.
 SELECTED CAPITALIZATION RATE AFTER TAX 0.1170 EQUALIZED TAX RATE
Mil Rate (per lk) 0.06590
 Assessment Level 0.70000 0.04613 0.0461 OVERALL CAP RATE 0.1631 (Before Tax)
14) Correlating his "Market Value Approach" figure of $1,460,000 with his `Income Approach" figure of $1,320,000, he reached a final market value for the subject parcel of $1,420,000 for the tax year October 1, 1978.
15) However, at the trial in 1989, the plaintiff submitted in evidence Exhibit CC, setting forth a revised valuation by Clyde for the tax year October 1, 1978, via the "Income Valuation Approach." In Exhibit CC, Clyde changed his "Stabilized Net Income Before Taxes" to $432,300, increasing it from the $215,447 figure set forth in Exhibit A.
16) Clyde then deducted from the $432,300 (Exh. CC, p. 4) a "Business Component" of $76,800, and a "Personal Property Component" of $40,753, to arrive at $314,747 as the "Income Attributed to Real Property". He then divided his new "Stabilized Net Income Before Real Estate Tax" figure of $314,747, by the same "Overall Cap. Rate" of 0.16313, used in Exhibit A, resulting in an "Indicated Value" for the subject property in 1978 of $1,930,000.
18) The decision in the case of United Illuminating Co. v. New Haven, 179 Conn. 624 (1980), p. 627, clarified the issue of a CT Page 1567 valid tax rate applicable in New Haven for the tax year October 1978. It spelled out the legal basis for allowing the City Assessor to establish a "phase-in" tax due and payable beginning July 1, 1979. The Board of Aldermen adopted an ordinance in compliance with the provisions of Public Act 1978-256 (now 62a(e) of the General Statutes), effective October 19, 1978. As a result the assessments on the list of October 1, 1978 were reduced from 70% to "43.5% of the true and actual value of all real property in the city." United Illuminating Co., supra, p. 634.
19) This decision is quite relevant to the issue of the validity of the appraisals made by the two appraisers, Clyde and Parente, and their opinions as to a true market value for the subject property for the tax year October 1, 1978. Plaintiff's appraiser, Clyde, in his revamped appraisal (Exh. CC), determined an "indicated value of $1,930,000 for 1978.
20) The defendant's appraiser, Perente, in his testimony, gave a detailed critique of Clyde's conclusions set out in his amended Report, Exhibit CC. He maintained that even assuming that all the Clyde calculations therein are correct, namely that $314,747 is the income attributable to the real property, the controlling factor is what the tax mill rate was on the assessment date of October 1, 1978. Parente pointed out that the mill rate on that controlling date was not 66.5 mills, but in fact was 47.3 mills — the rate mandated by the decision in United Illuminating Co. v. New Haven, 179 Conn. 627 (1980).
21) That decision explained, page 631, that the last revaluation of real property in New Haven prior to 1978 was conducted in 1964. And it brought out that "the New Haven tax assessor did revaluate real property in the city as of October 1, 1978."
22) At page 631, it makes clear that "the city was required to abandon its prior 1964 assessment rate of 60 percent (60%) of true and actual value, and to assess in accordance with 12-62a(b) at the uniform rate of 70 percent of true and actual value."
23) Appraiser Parente further pointed out that on page 4 of Clyde's 1989 Report (Exh. CC), he multiplied the .70% assessment level (mandated for October 1, 1978) by a "Mil rate (per lk) of 46.9, instead of the 65.9 mill rate in effect on October 1, 1978. Had Clyde done so, the resulting product would have been .0328, and not the .0461 used by Clyde to arrive at his $1,930,000 fair market value figure.
24) Parente further stated that by adding .0328, instead of Clyde's .0461, to Clyde's "Selected Capitalization Rate After Tax), would produce a "composite rate" of .1498, and not .1631, as CT Page 1568 determined and used by Clyde.
25) Had Clyde divided his $314,747 income figure by Parente's corrected composite rate of .1498, the result would be a market value of $2,101,000, not Clyde's $1,900,000 — a difference of $281,000.
26) Appraiser Parente further posited his critique on the fact that the manager of the Howard Johnson restaurant in the motel testified without contradiction, that the sum of approximately $62,103 was paid to the owner, Becker, as "rental for the restaurant for the year 1978."
27) Adding the $62,103 to Clyde's "Income Attributed to Real Property" (p. 4 of Exh. CC) of $314,747 would create a total of $376,250, as the correct income figure.
28) And dividing the total amount of $376,850 by Parente's corrected composite capitalization rate of .1498, would yield a total market value of $2,336,330, instead of Clyde's $1,930,000 — a difference of $596,000.
20) The appraisal report of the city's appraiser, Parente, was introduced as defendant's Exhibit 9. In conjunction therewith, Parente brought out that he considered three accepted appraisal approaches — reproduction cost, sales comparison, and income capitalization.
30) In Parente's opinion, an income capitalization approach was the most relevant one to calculate the market value of the subject property, because there were three explicit leases concerning market value from several reliable parties involved. He cited 1) the lease between the Howard Johnson Company and Stanley Becker, the owner of the lease-hold on the subject realty: 2) the lease between Becker and the Connecticut Food Company, the owner and operator of the Howard Johnson restaurant on the premises; and 3) a ground rent lease.
31) In his Report (Exh. 9, p. 12), he explained that
 "The Income Capitalization Approach, however, was developed and relied upon in this report, since facilities similar to the appraised property are purchased for their income producing potential. Consequently, an approach to value based on the income generated from the property most accurately reflects the mind of the typical buyers of investment properties. The Mortgage-Equity Capitalization technique was utilized in the subject case, because the CT Page 1569 technique takes into account the availability of mortgage financing in the current market and the equity yield required by a prudent purchaser.
 In conclusion, the Income Capitalization Approach was given primary reliance, with the Cost Approach developed as a check."
32) Parente further explained (Tr. of Ev., p. 112) that the income in the instant matter "is generated from both the building and the land and the tenants that are using the buildings."
33) He emphasized that the Howard Johnson-Becker (owner) lease exacted a "net rental", which is "ideal" for an appraiser to deal with because "he's got net income to work with", taxes already having been deducted.
34) All that was required under the net income approach, he explained (Tr., p. 112), was to calculate the net operating revenue and divide it by the appropriate capitalization rate. The same procedure applied to the restaurant rent received by the owner, Becker, which was also a net rental.
35) Defendant City's appraiser, Parente, at the trial, filed Exhibit 10, showing his calculation for the market value of the subject property as of October 1, 1978, the controlling assessment date, as follows:
 Scheduled Gross Annual Income
 Motor Lodge Minimum Rental $ 212,000. Percentage Rental 44,034. Restaurant (7, 185 S.F. @ $8.75) 62,869.* -------- Less: $ 318,903. Vacancy Collections Loss $ 6,378. -------- Effective Gross Income $ 312,525.
 Operating Expenses $ 9,376. (Management, 3%) -------- Net Operating Income $ 303,149.
 Ground Rent Income $ 46,590. -------- Total Net Income $ 349,739.
Market Value, as of 10/1/78, is CT Page 1570 $349,739. divided by .115 = $3,041,000.
 *The actual rent from the restaurant for 1978 was $62,804.46 plus $14,821.81 = $77,626.27
36) In Parente's Report (Exh. 9, p. 19 ), he developed a market value for the subject property as of October 1, 1986 and October 1, 1987, by dividing his calculated net operating income figure of $677,523 by an overall capitalization rate of .11 percent, yielding a market value of $6,160,000 for both 1986 and 1987.
37) For the October 1, 1988 year, following the same formula Parente applied in his Report for the years 1986 and 1987, he found the total net income to be $695,200, which he divided by the same cap rate of .115 percent, yielding $6,045,000 as his market value for 1988, a figure slightly lower than the $6,160,000 for 1986 and 1987.
38) A Comparison of the Market Values of the two appraisers for the years in issue show the following:
Year Appraiser Clyde Appraiser Parente (Plaintiff) (Defendant — City)
1978 $1,930,000 (Income Valuation, $3,041,000
1986 3,750,000 (Exhibit A) 6,160,000 ( Exhibit 9, Income Capitalization, Ex. CC )
1987 4,532,500 " 6,160,000 "
1988 5,315,000 " 6,045,000 "
39) The defendant city assessed the subject property as of the last decennial October 1, 1978 revaluation, at a 100 percent market value of $2,123,800, and at a 70 percent assessment value of $1,486,667. These 1978 valuations were carried forward and used by the defendant for tax assessment purposes in the tax years October 1, 1986, 1987, 1988.
Conclusion
 I.
The undersigned has endeavored to dissect the important elements in the maze of conflicting expert opinion evidence adduced. He recognizes that the credibility to be attached to the testimony of a particular expert may be a crucial factor to a decision herein. As Feigenbaum v. Waterbury, 20 Conn. App. 148
CT Page 1571 (1989), p. 152, makes clear, however, the "acceptance or rejection of the opinion of the expert witness is a matter peculiarly within the province of the trier of fact. . . ."
Well-recognized appraisal principles sanction the valuation method adopted by appraiser Parente in relying on the leases for the property as also consistent with those principles. See Uniroyal, Inc. v. Board of Tax Review of the Town of Middlebury (Uniroyal I), 174 Conn. 380, 389 A.2d 734 (1978).
Accordingly, this court is forced to conclude that the plaintiff has not been able, by the required fair preponderance of evidence, to prove that the assessment made on October 1, 1978 — the basis for the assessments made for the subsequent years 1986, 1987, 1988 — the subjects of the instant complaint — was so grossly disproportionate that it could not have been arrived at except by disregarding the statutory provisions. Uniroyal, Inc. v. Board of Tax Review, 182 Conn. 619 (1981) (Uniroyal II). The fact that the 1978 valuation and assessment was applied to successive grand lists for the years 1986, 1987, 1988 does not permit a different result. Uniroyal II, supra, p. 624.
The footnote at the bottom of page 633 of Uniroyal II is a valid guide to formulating a decision herein, by pointing out that "the plaintiffs' burden in such a case is a difficult one." And, quoting from the earlier case of Connecticut Coke, Inc. v. New Haven, 169 Conn. 619, (1981), p. 633, it states "[p]roper deference must be given to the judgment and experience of assessors." Uniroyal II quotes from other previous decisions of our Supreme Court, emphasizing, p. 631, that "[t]he law contemplates that a wide discretion is to be accorded to assessors, and unless their action is discriminating or so unreasonable that property is subtantially overvalued and thus injustice and illegality result, their opinion and judgment shall control in the determination of value for taxation purposes."
Attacking the validity of the assessments in issue, as they relate back to the original 1978 assessment, the plaintiff, in its trial brief, argues that the city failed to revalue property as of the decennial date of October 1, 1988 following October 1, 1978, and that, therefore, the city was not in compliance with the statutory mandate of 12-62 of the General Statutes, requiring a revaluation every ten years. The defendant city, except for the enactment of P.A. 89-251, was required to comply with 12-62.
In its legal memorandum, the plaintiff claims that P.A. 89-251 was prospective only in its operation, and could not have a retroactive effect to exonerate the defendant from its failure to revaluate in the decennial year 1988. It's reliance for legal support on the decisions in Little v. Ives, 158 Conn. 452 (1979), CT Page 1572 and Lavieri v. Ulysses, 149 Conn. 396 (1964), is misplaced. The factual situations involved in those cases were entirely dissimilar to the one herein.
The undersigned is constrained to conclude that P.A. 89-251 did validly advance the October 1, 1988 cut-off date, for a decennial revaluation, to October 1, 1991; and that the defendant city was thereby exonerated. The defendant's assessor testified that such a real property revaluation is presently being undertaken in New Haven.
Conclusion
 II.
The Sales Assessment Ratio Issue
The main thrust of the plaintiff's case appears to be addressed to the claim that the defendant should have applied a "sales assessment ratio" to the tax assessments made by the defendant's assessor for the years in issue herein — 1986, 1987 and 1988.
This "sales assessment ratio" is developed annually by the State Office of Policy and Management, pursuant to the provisions of 10-261a of the State statutes, which is captioned, "Equalized net grand lists for the purpose of educational equalization grants." (underlying supplied)
On this issue the expert testimony of the witness called by the plaintiff, Frederick M. Chmura, the manager of equalization and grants in the State Office of Policy and Management, the official in charge of administering the sales assessment ratio program in the 169 Connecticut towns, is quite relevant. Chmura explained that, as the caption for 10-261a makes clear, this ratio is used primarily for "educational grants," that is, grants based on the taxable wealth of the Connecticut towns. In clarification of the issue herein, Chmura brought out that, of the three classes of property involved under this statute, the second class is concerned with "commercial and industrial properties, " which class embraces assessments of hotels. The years involved in this State program follow the annual assessment periods from October 1st of one year to September 30th of the following year.
Chmura testified that the sales assessment ratio for the tax years 1985, 1986 and 1987, for commercial properties for New Haven, were as follows:
1985 — based on 250 sales of real property — 26.5% CT Page 1573
1986 — based on 160 sales of real property — 20.9%
1987 — based on 112 sales of real property — 15.9%
And he admitted that the "lower the sales assessment ratio for a particular town, the higher the resulting equalized grand list for that town, . . ." and that "the higher the per capita wealth, the lower the grant that the state will have to provide to the particular municipality."
Chmura also admitted that the New Haven sales data for the years 1985, 1986 and 1987 support the conclusion that "the sales price of [real] properties in New Haven tended to appreciate in value." (Tr., p. 26). And, based on his experience, he also acknowledged that the value of properties in New Haven, since 1978, also had tended to appreciate.
And, as a final coda to Chmura's testimony, he noted (Tr. of Ev., p. 15) that the City of New Haven was in full compliance with the requirements of 10-261a, mandating the yearly furnishing of sales data by the town clerks of all the Connecticut towns, of sales information to Chmura's office.
Counsel for the plaintiff admitted that the decisions of our Supreme Court, and particularly the Uniroyal II decision — Uniroyal, Inc. v. Board of Tax Review, 182 Conn. 619 (1981) — gives strained, if any, support to the use of the "sales assessment ratio" approach to real property assessments. The plaintiff in Uniroyal II, p. 624, relied on the decision in Kays, Inc. v. Board of Tax Review, 170 Conn. 477, 481, 365 A.2d 207
(1976), for the applicability of the sales assessment ratio. The Uniroyal II decision, p. 624, found no error in the conclusion of the Kays trial court that "the evidence presented was insufficient to establish an overage ratio." Uniroyal II also makes clear, p. 624, that "we have carefully limited use of the ratio as a remedy to cases where the evidence clearly establishes that the assessor failed to follow the requirements of General Statutes 12-64."
The plaintiff in the instant case also relies on the decision in Lerner Shops of Connecticut, Inc. v. Waterbury, 151 Conn. 79,85, 193 A.2d 472 (1963), claiming that it supports its claim of the applicability of the disputed ratio. But the Uniroyal II decision, p. 625, rejected the applicability of the Lerner Shops decision, stating that "[i]n Lerner Shops we based our acceptance of the average ratio remedy upon our finding that `Waterbury wholly failed to carry out this statutory mandate [of 12-62] and indeed ignored it.'" And, at p. 625, it added that "[n]o similar practice of deliberately ignoring the statutory command exists in this case." CT Page 1574
Continuing the reference herein to the Uniroyal II decision, the court's holding, p. 626, is quite relevant that:
 "The decisions of this court indicate that use of the average ratio approach is not a supplement to fair valuation as mandated by the statute; it is appropriate only as an evidentiary tool useful in establishing that the statutory requirements have not been followed and as a remedy for such failure. The plaintiffs have introduced the average ratio evidence in an effort to demonstrate that although the assessor applied a 65 percent valuation factor to their property, he actually applied a much lower valuation to other Middlebury property."
Analyzing the assessment situation that existed in the town of Middlebury (where plaintiff was taxed), the Uniroyal II court compared the average ratio of 1975, 1976 and 1975 sales prices, to assessed value in 1971 (the date of the last Middlebury decennial revaluation). It concluded "that the relation between the selling price in 1976 and the assessed value (at 1971 prices) was 40 percent, reveals that the price of the average parcel increased by 63 percent in the five years between 1971 and 1976." If the same analysis is made in the instant case it would likewise show a wide disparity between sales prices in 1985, 1986, 1987 and 1988, and the low percentage that the 1978 assessed value would have to those sales prices. It would indicate, as pointed out in Uniroyal, p. 627, that such "evidence adduced by the plaintiffs reveals primarily that real estate values were increasing during this period."
Furthermore, the court's observation, p. 629, is quite apropos to the instant situation:
 "The plaintiffs' property most likely benefited from continued use of the 1971 valuation figures for assessment purposes throughout the 1970's and the failure of the 1971 figures to reflect property value increases in subsequent years as much as any other property owner. Such variation accruing within ten-year periods is a permissible variation under the legislative scheme for assessment. General Statutes 12-62. We have said that: `Tax assessors are required to recognize and act on the principle that the true value of a fixed asset such as real estate is fairly constant and must be gauged, not by conditions temporary and CT Page 1575 extraordinary, but by those prevailing over a period of time, and the assessors, in listing values of property for taxation, may, to a certain extent, disregard the excesses of a boom as well as the despair of a depression. . . .'"
And the undersigned believes that the Uniroyal court's holding at p. 630 is fully applicable to a decision herein.
 "Because the remedy for changing market values is set forth in General Statutes 12-62, we conclude that use of the average ratio approach is not applicable to discrepancies in valuation which arise during the ten-year period between valuations. See Burritt Mutual Savings Bank v. New Britain, 146 Conn. 669, 678-79, 154 A.2d 608 (1959). Thus, so long as the Middlebury valuation established in 1971 fairly reflected 1971 values, we do not utilize the average ratio evidence to remedy any discrepancies which might occur as 1971 assessments were carried forward through the decade."
And he further feels compelled to reach the conclusion reached in Uniroyal II, p. 633, that "[t]he average ratio information introduced by the plaintiffs failed to prove that the assessment procedure was not in strict conformance with the statutory requirement."
In view of the importance attached by the undersigned to the Uniroyal II decision vis-a-vis the instant case, it is worthy of mention that a check of the decisions of our Supreme Court subsequent to that decision show that the painstakingly reached holdings therein, as to the assessment of real property in Connecticut, are still in full force and effect as to the issues decided therein.
Ralston Purina Co. v. Board of Tax Review, 203 Conn. 425
(1987), relying on the Uniroyal case, held, p. 441, that the only remedy available to the plaintiff was under 12-62. The judgment of the trial court ware set aside, and judgment for the defendants, the Board of Tax Review was entered.
The decision in 84 Century Limited Partnership v. Board of Tax review, 207 Conn. 250 (1989), was not decided under 12-62, but rather on the basis that 12-55 gave the assessor in Rocky Hill the power to adjust a real estate assessment in the interim years between the decennial revaluation on the ground a sale of the property in question showed that it had greatly increased in CT Page 1576 value. Ralston, p. 252, brought out that the sale price in 1984 to the plaintiff was $57,539,739, whereas the applicable assessment on the property for the years 1979, 1980 and 1981 was only $23,820,950, an increase of 141 percent. Stop Shop Cos. v. East Haven, 210 Conn. 233 (1989), dealt only with the assessment of personal property on a yearly basis.
Based on the evidence adduced and the applicable law, the undersigned enters judgment in favor of the defendant herein on all the counts of plaintiff's complaint involving the assessments made by the defendant's assessor for the years 1986, 1987 and 1988.
It, therefore, holds that:
1) The plaintiff has failed to prove that the defendant's assessor did not establish the assessments on the plaintiff's real property in compliance with the mandate of the controlling statute, 12-62; nor has it proven that the defendant has failed to comply with 12-64 of the statute.
2) The plaintiff has failed to prove that the valuations of the subject property on the assessment dates in issue, i.e., October 1, 1985, October 1, 1986, and October 1, 1987, were not the required percentage of its true and actual value: and that the assessments were excessive and unlawful.
3) The plaintiff's evidence relative to the application of a "sales assessment ratio" is not found proven, and, therefore, not required to be applied to the assessments in issue in the case.
4) The plaintiff has failed to prove that the assessments placed therein by the defendant's assessor bore a disproportionately high share of the tax burden of real estate in the defendant city; nor that said assessments were inequitable and unjust in relation to comparable property in the defendant city; nor that said assessments were made contrary to the statutory provisions determining the valuation of real property; nor that the assessments made by the defendant's appraiser for the years in issue, were required to be assessed at an average ratio of less than 70% of the present, true and actual value.
The plaintiff's appeal from the Board of Tax Review of the defendant city is, therefore, not sustained.
Judgment is entered accordingly for the defendant City of New Haven.
A. FREDERICK MIGNONE State Trial Referee CT Page 1577