[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter is presented to the court as an appeal from the findings and determinations of the Board of Tax Review of the Town of Bethel.
From the credible evidence adduced at trial, the court finds the following: CT Page 9612
The applicant, First Bethel Associates, at all times pertinent herein, was the owner of a strip shopping center located in the Town of Bethel at 279-291 Greenwood Avenue. This property, totalling 3.753 acres, is located in a general commercial zone, has frontage and access on three different streets and is improved by approximately 27,860 square feet of visible, rentable floor space. The anchor store of this complex, constructed in 1957, occupies approximately 13,884 square feet, and includes a full basement. The remainder of the strip, built about ten years later, consists of a row six stores devoted to general retail sales and service occupying approximately 11,500 square feet and a bank, added in 1978, occupying an additional 2,500 square feet.
At all times pertinent herein, all usable space in the shopping center was rented, with each of the tenants occupying their respective areas under written leases. Each lease contains a tax recovery clause regarding tax increases and a provision requiring the payment of monthly C.A.M. charges. (Common Area Maintenance.)
Accordingly, at time of trial, the parties stipulated to the following facts:
 On October 1, 1988, the Assessor of the Town of Bethel placed a One Hundred (100%) percent value on the [subject property] in the amount of TWO MILLION EIGHT HUNDRED NINETY TWO THOUSAND NINE HUNDRED SEVENTY ($2,892,970.00) DOLLARS.
 The Assessor determined that all property should be liable for taxation at Seventy (70%) per cent of its One Hundred (100%) per cent valuation on that assessment date, which for this property is TWO MILLION TWENTY FIVE THOUSAND EIGHTY ($2,025,080.00) DOLLARS (assessment value).
 The Board of Tax of the Town of Bethel exists pursuant to Connecticut General Statutes Section 12-111 and is authorized to hear appeals from tax assessments.
 The FIRST BETHEL ASSOCIATES, or its attorney or agent duly appealed to the Board of Tax Review of the Town of Bethel claiming to be aggrieved by CT Page 9613 the action of the Assessor, appeared before said board and presented evidence to it and offered to be sworn and answer all questions concerning the property but the Board made no changes in the assessment value.
 The applicant brought this action within two months of the action of the Board of Tax Review.
 The property was assessed at TWO MILLION TWENTY FIVE THOUSAND EIGHTY ($2,025,080.00) DOLLARS on the Lists of October 1, 1988, October 1, 1989, October 1, 1990 and October 1, 1991.
The taxes levied for the above Lists are as follows
Year Mill Rate Tax
 1988 15.6 31,591.25 1989 16.4 33,211.31 1990 16.7 33,818.84
 The . . . [applicant] has paid all the tax levied on the Lists of 1988, 1989 and the first two quarters of the tax due on the List of 1990, or $16,909.42, for a total of $81,711.98.
The applicant seeks a reduction in its property assessment and a corresponding refund of excess taxes paid.
At issue is the determination of fair market value and the method used to obtain same.
Section 12-63 of the General Statutes requires the assessor and the board of tax review to set the value of property at its fair market value. Further, the statute designates present true and actual value as fair market value, and not the value at a forced or auction sale.
The words market value, actual valuation, fair market value and similar terms "`mean a value in a market in a place or in conditions in which there are, or have been or will be within a reasonable time, willing sellers and able and ready buyers of property like that to be assessed.'" Federated Department Stores, Inc. v. Board of Tax Review, 162 Conn. 77, CT Page 9614 87 (1971), quoting from Underwood Typewriter Co. v. Hartford,99 Conn. 329, 336 (1923).
Section 12-63b, subsection (a), sets forth three accepted methods of estimating true and actual value which may be used for the assessment of rental income producing property. It provides in pertinent part that:
 The assessor, or board of assessors in any town, when determining the present or true and actual value of real property as provided in section 12-63, which property is used primarily for the purpose of producing rental income, and with respect to which property there is insufficient data in such town based on current bona fide sales of comparable property which maybe considered in determining such value, shall determine such value on the basis of an appraisal which shall include to the extent applicable with respect to such property, consideration of each of the following methods of appraisal: (1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property, and (3) capitalization of net income based on market rent for similar property.
The assessor of the Town of Bethel through its revaluation company's expert used three methods including a comparable sales analysis to arrive at its valuation of the property, while the applicant used but one, the income capitalization method.
On appeal, it is a question of fact for the trier as to whether the method used for valuation appears in reason and logic to accomplish a just result. National Folding Box Co. v. New Haven, 146 Conn. 578, 588.
An expert witness for the applicant and one for the respondent testified as to the validity of their respective methods of estimating value and pointed out problems involved in using a different approach. The trial court, however, can accept or reject the testimony of expert witnesses offered by one party or the other in whole or in part. Midway Green Corporation v. Board of Tax Review, 8 Conn. App. 440, 443
CT Page 9615 (1986). The court can accept or reject portions of each appraiser's testimony and arrive at a compromise figure as most accurately reflecting fair market value. Whitney Center, Inc. v. Hamden, 4 Conn. App. 426, 430 (1985).
In an appeal from a board of tax review, the applicant has the burden to show that he is aggrieved by the board's decision, namely, that his property has been overassessed. Gorin's, Inc. v. Board of Tax Review, 178 Conn. 606, 608
(1979).
When determining whether or not the property has been overvalued, "[t]he law contemplates that a wide discretion is to be accorded to assessors, and unless their action is discriminatory or so unreasonable that property is substantially overvalued and thus injustice and illegality result, their opinion and judgment should control in the determination of value for taxation purposes." Stamford Apartments Co. v. Stamford, 203 Conn. 586, 589 (1987), quoting from Federated Department Stores, Inc., 162 Conn. 77, 86
(1971), quoting Burritt Mutual Savings Bank v. New Britain,146 Conn. 669, 675 (1959).
Since the process of estimating value of property is one of approximation and judgment, assessors have considerable discretion in valuing property for tax purposes. Burritt Mutual Savings Bank v. New Britain, supra, 675.
"[P]roper deference must be given to the judgment and experience of assessors." Connecticut Coke Co. v. New Haven,169 Conn. 663, 668 (1975). However, such deference is not a presumption in favor of the validity of the assessment which it is the taxpayer's burden to rebut. Stamford Apartments Co. v. Stamford, supra, 589. Only if the court finds that the property has been overvalued by the assessors can it exercise its power to correct the valuation. Hutensky v. Avon,163 Conn. 433, 437 (1972).
When the taxpayer is found to be aggrieved by the decision of the board of tax review, namely, that its decision will result in the payment of an excessive, unjust and therefore illegal tax, the court may then proceed to exercise its broad discretionary power to grant such relief as is appropriate; Gorin's, Inc. v. Board of Tax Review, supra, 608; and the court finds such aggrievement in the case at bar. CT Page 9616
As indicated above, the assessor used a comparable sales analysis as one of its methods to determine the property's fair market value. Since there were insufficient data in the Town of Bethel concerning current sales of comparable property, out-of-town properties were used. The court finds that those properties, however, were not actually comparable to the applicant's property. Further, one of the sales occurred after the relevant revaluation date and, as argued by the applicant, no comparable contains an anchor store.
The absence of an anchor store is a crucial distinction between the comparables and the subject property because, as indicated by testimony, anchor stores produce lower rents per square foot and therefore tend to depress the price per square foot for a shopping center containing one. Additionally, many of the "comparables" were located on busier highways and had more convenient access to an interstate than the subject property, yet the assessor did not adequately adjust for these differences.
Consequently, the assessor's comparable sales analysis is unacceptable. Similarly, the assessor's cost analysis flawed in that the revaluation company's expert attributed an actual age to the premises of twenty-one years, when more than one-half of the square footage of the center was constructed more than thirty years ago.
Moreover, rather than use the actual age for depreciation purposes, the expert assumed an "effective age" of ten years. Had the actual age of the premises been used, the cost analysis would have yielded a considerably different result than the one adopted by the assessor, and even when applied without error, this method is more of an indicator of the upper limits of value rather than the amount a willing buyer would pay a willing seller for a property used primarily for the purpose of producing rental income.
The third method or approach considered by the revaluation company and the only method used by the applicant's expert, is the income capitalization approach. As defined in the narrative appraisal report of the assessor's expert (Defendants' Exhibit 2), that approach consists of "[a] set of procedures in which an appraiser derives a value indication for income-producing property by converting CT Page 9617 anticipated benefits into a value estimate. This conversion is accomplished by capitalizing a single year's income expectancy or an annual average of several years' income expectancies at a market derived capitalization rate or a capitalization rate that reflects a specified income pattern."
As stated in plaintiff's brief, the main dispute between the parties concerns the proper determination of market rent to be used for capitalization of net income. The plaintiff maintains that existing leases encumber the property for a period extending beyond the next town-wide revaluation and that the revaluation company should have considered the actual rental income under the existing leases as required by section12-63b(b) of the General Statutes.
That section provides:
 For purposes of subdivision (3) of subsection (a) of this section and, generally, in its use as a factor in any appraisal with respect to real property used primarily for the purpose of producing rental income, the term `market rent' means the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space. In determining market rent the assessor shall consider the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination.
While the revaluation company claims to have considered the actual rental income, it does not appear to have been factored into its analysis. Consequently, the assessor's valuation is excessive while the applicant's valuation of $1,122,083.00, which is based solely on actual rental income, is unreasonably low.
The court, after giving due consideration to the actual rental income reserved under the existing leases during its process of determining market rent, finds that the subject property had a market rent for calendar 1987 of $273,500.00 and, as of October 1, 1988, a fair market value of $1,789,980.00. In so doing, the court has accepted in part and rejected in part the income capitalization methods of both CT Page 9618 parties.
The court arrived at its valuation by increasing the anchor store's rent from $3.46 to $6.00 per square foot, a more reasonable and realistic figure, reflective of both actual and market rent. As a result of this increase, the total rent for the year increased from $203,896.00 to $239,200.00, a difference of $35,304.00. The only rent that was not reflective of both actual and market considerations, and therefore one that had to be adjusted, was Friendly's. Friendly's rent was increased from $3.90 to $10.00 per square foot and, as a result, rent for the year increased from $4,500.00 to $20,000.00. This adjusted annual rent when added to the original C.A.M. of $3,300.00, totals $23,300.00 as opposed to the former total of $7,800.00, a difference of $15,500.00.
Inserting these adjusted annual rents into the applicant expert's format provides the following:
 Gross Income — as provided by applicant $203,896.00 additional rent and C.A.M. received in 1988 for calendar 1987 18,800.00
 Increase based on finding of market rent increases for anchor store and Friendly's 50,804.00 ----------- $273,500.00
 Less: Expenses actual and estimated — Fixed $36,463.00 Operating 38,564.00 Reserves 
replacement 15,000.00 ----------- $90,027.00 -90,027.00 ----------- Net income $183,473.00
The court finds that the net income of $183,473.00 capitalized at 10-1/4 percent equals $1,789,980.00 the fair market value of the property. The assessed value is equal to CT Page 9619 70 percent of $1,789,980.00 or $1,252,986.00.
Based upon the foregoing, the court reduces the assessed value of the property for the lists of 1988, 1989, 1990, 1991 and thereafter to 1,252,986.00, its correct and accurate 70 percent assessed value based on a correct full fair market value of $1,789,980.00. Further, the court orders a refund for taxes paid on the difference between $2,025,080.00, 70 percent of claimed fair market value of $2,892,970.00, and the correct assessment of $1,252,986.00 as follows:
List Overvaluation Mill Rate Overpayment
1988 772,094.00 15.6 12,044.67 1989 772,094.00 16.4 12,662.34 1990 772,094.00 16.7 (1/2 year) 6,446.98 --------- Total refund ordered $31,153.99
The applicant's appeal is sustained.
West, J.