## PHILIP IRELAND *v.* TOWN OF WETHERSFIELD
### (14401)

Dupont, C. J., and Heiman and Spear, Js.

Argued March 19—officially released May 21, 1996

*Robert Heagney*, for the appellant (plaintiff).

*Kerry R. Callahan*, with whom, on the brief, was *Jennifer A. Osowiecki*, for the appellee (defendant).

DUPONT, C. J. The plaintiff applied, on July 3, 1990,[1] for relief, pursuant to General Statutes §§ 12-117a and 12-118, from a claimed excessive tax valuation of his real estate by the defendant town of Wethersfield for

---

[1] The plaintiff amended his application on November 29, 1994, and the trial court rendered its final decision on January 10, 1995.

each assessment year from 1989 to the date of any judgment. The property was assessed in connection with a decennial revaluation of real estate required by General Statutes § 12-62. The trial court found, relying on the town's assessment, that the true and actual value of the property on October 1, 1989, was $769,000 and that its assessed value was 70 percent of that value or $538,300.

The court rendered judgment reducing to that figure the assessment that the town had made, from which the plaintiff appeals, claiming that the court improperly (1) took judicial notice of the judgment in another action between the same parties, (2) failed to take into account the presence of wetlands on the property, (3) allowed the town's assessor to testify as to the value of the property without personal knowledge of it or knowledge of specific comparable property sales, and (4) kept the burden of proof on the plaintiff after the plaintiff showed that the defendant's valuation was erroneous.[2]

The trial court concluded that the highest and best use of the property was for residential purposes, namely, as a subdivision with twelve building lots. It found that on the assessment date in question, October 1, 1989, "the plaintiff's subdivision was a viable subdivision with subdivision approval and wetlands commission approval," and that "[l]ots in the subdivision could have been sold if the plaintiff had provided the suitable guarantee required by the town of Wethersfield that all public improvements would be completed."

The issues revolve around the difference of opinion between the plaintiff and the defendant as to what was the highest and best use of the land, which in turn rests

---

[2] There is no authority for the proposition that the burden of proof ever shifts from an aggrieved taxpayer to the town in an action brought pursuant to § 12-117a, and we need not discuss the claimed issue.

on the status or readiness of the parcel's development for sale as building lots, and the proof necessary for a finding of an excessive valuation. The plaintiff's appraiser testified that the highest and best use of the land was recreational and that it should be valued as one parcel whereas the defendant's assessor argued its best use was as individual residential building lots.

The trial court, in its memorandum of decision, outlined the zoning and wetlands permit history of the plaintiff's eight acre parcel. It was purchased in the 1960s and in 1980, the plaintiff obtained subdivision approval for twelve building lots, with the restriction that he would not convey any lots until all public improvements were made to the satisfaction of the town. In addition to his application to the planning and zoning commission, the plaintiff applied to the inland wetlands and watercourses commission for permission to conduct work on wetlands located on the eight acres. His application for a wetlands permit was granted, and, pursuant to it, he installed storm sewers and sanitary sewer lines, filled in wetlands and conveyed title to roads and open space wetlands to the town. In September, 1990, and thereafter, the building inspector refused to issue a building permit on the ground that the permit issued by the wetlands commission in 1980 had expired. The plaintiff's second application for a wetlands permit was also denied in October, 1990. On May 4, 1991, the town informed the plaintiff by letter that the town did not recognize the 1980 wetlands permit as valid. In a separate suit, brought by the plaintiff against the town, and decided on September 24, 1993, another trial court held that the unilateral invalidation of the wetlands permit in 1990 by the town was invalid and that the permit of the wetlands commission issued in 1980 continued in full force and effect.[3]

---

[3] Under the Inland Wetlands and Watercourses Act, General Statutes §§ 22a-36 through 22a-45, an inland wetlands municipal agency may grant

The plaintiff's appraiser valued the property at $206,000 and the defendant's appraiser, at $769,000. The plaintiff's appraiser deemed the land to be best suited for recreational use, but, according to the trial court, used comparable sales that were unrelated to such use in establishing value. The defendant's assessor testified that he had studied land sales in Wethersfield for three years prior to revaluation and that he based his valuation of the plaintiff's lots on sales of forty to fifty lots or larger parcels. He did not, however, cite any particular comparable sale or sales to support his valuation of the plaintiff's property. He ascribed a value to each lot and then reduced that value by 50 percent because the improvements to the subdivision were not complete as of the assessment date.

The first two claims of the plaintiff are intertwined. If the plaintiff had a wetlands permit as of October 1, 1989, the presence of wetlands would make little difference in value. If the plaintiff did not have such a permit, the presence of the wetlands would affect the value because, without the permit, the plaintiff would not have twelve building lots.

The plaintiff primarily bases his argument that the defendant's assessment was excessive on the claim that the defendant erroneously based its assessment on the belief that the plaintiff had a wetlands permit as of October 1, 1980. The plaintiff testified that he had been told by the town's head building inspector in the summer of 1989 that he did not have an approved wetlands permit. He did not introduce any other evidence to substantiate the fact that he did not have a viable wetlands permit as of October 1, 1989.

permits to conduct regulated activities. The permits are valid for five years, and the agency may not extend the original permit beyond ten years from the date such permit was granted. General Statutes § 22a-42a (d). Neither the plaintiff nor the defendant relies on this section to substantiate whether the wetlands permit had expired by October 1, 1989, by operation of law.

Because the court took judicial notice of a separate action between the same parties in the Superior Court that determined that the plaintiff did have a permit from the wetlands commission on October 1, 1989, the plaintiff claims to have been harmed. He claims that that fact should not have been in evidence because it was a fact found in the parallel case in September, 1993, which could not be applied retroactively to the situation as it existed on October 1, 1989. It was the plaintiff, however, who introduced the memorandum of decision in that case as an exhibit at trial. There is nothing in the record to establish that the trial court applied the holding of the case retroactively or relied on the resolution of the separate action to find that a wetlands permit existed as of October 1, 1989. Other than the plaintiff's testimony, which the trial court did not find credible, there was no evidence that the plaintiff's wetlands permit was not valid as of that date. We, therefore, conclude that the court's finding that the plaintiff had the requisite permits to use his land as a subdivision with twelve building lots, and that the highest and best use of the land was as residential building lots was proper.

The plaintiff also claims that the town assessor's testimony should be discounted because he had no personal knowledge of the plaintiff's property or of any particular comparable sales when he determined its assessment value.

A private firm prepared the valuation of the plaintiff's property on the basis of land sales in the entire town over a three year period. The town's assessor called this a "broad comparable sales approach" but did not compare specific sales of property similar to that of the plaintiff. The plaintiff claims that the trial court could not base its conclusion as to value on an allegedly impermissible method of valuation, namely a "broad comparable sales approach."

A trial court hears a § 12-117a tax appeal case de novo; *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 25 n.1, 633 A.2d 1368 (1993); with the burden of proof on the taxpayer who claims aggrievement to prove that the assessor's valuation is not the true and actual value of the property. *Executive Square Ltd. Partnership* v. *Board of Tax Review*, 11 Conn. App. 566, 571, 528 A.2d 409 (1987). A trial court need not defer to an assessor's value in the absence of any evidence as to how the assessment value was determined. *Carol Management Corp.* v. *Board of Tax Review*, supra, 37. Thus, an insufficiency of data or the selection of an inappropriate method of valuation can be the basis for not crediting an appraisal report as to value. See *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, 220 Conn. 335, 343, 597 A.2d 326 (1991). An assessor's valuation, therefore, is not granted a presumption in favor of its validity. *Stamford Apartments Co.* v. *Stamford*, 203 Conn. 586, 525 A.2d 1327 (1987).

If an assessment is based on a method of valuation that is invalid as a matter of law; see *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 100, 626 A.2d 1292 (1993); or if factors prevent a trial court from correctly determining whether the assessment is based on the true and actual value, or the fair market value of the property, it cannot be upheld. See *Grossomanides* v. *Wethersfield*, 33 Conn. App. 511, 517, 636 A.2d 867 (1994).

The defendant is attempting to rely on general probabilities to establish values of land for purposes of a decennial revaluation. There are instances where a general mathematical formula applicable to all land similarly zoned may be used in the absence of any comparable land sales. See *Burritt Mutual Savings Bank* v. *New Britain*, 146 Conn. 669, 674–76, 154 A.2d 608 (1969). This case, however, is not one of them. Here, there were many comparable land sales cited

as a group by the assessor, but no sale was cited to substantiate the valuation of the plaintiff's property by the assessor.[4] Even when a method of valuation based largely on a mathematical process applicable to all real estate with the same use may be used, the true and actual value as established by the assessment cannot be upheld on appeal to the trial court if the plaintiff can show that the factors used in the mathematical process were improper and resulted in an unjust assessment. Id., 676.

In *Burritt Mutual Savings Bank,* the assessor valued all land located in a business zone according to a basic unit valuation of land, without regard to the particular land of the plaintiff taxpayer. The factors involved in the basic unit valuation were known, however, to the plaintiff who could have established, therefore, that the factors used were improper, resulting in an unjust and illegal assessment. Id., 676–81. The plaintiff in the present case could not show that the factors involved in the "broad comparable sales approach" led to an excessive tax because no factors, except a general view that land values were rising, were described or enumerated in the assessor's testimony.[5]

---

[4] The defendant did not introduce an appraisal report into evidence. His only exhibits were a map of the plaintiff's property and twelve assessment cards for the twelve subdivided building lots.

[5] Excerpts from the cross-examination of the defendant's assessor follow:

"Q. Mr. Dagata, can you identify for this court one comparable that you relied upon in making this judgment?

"A. No, I can't identify one. It takes a long explanation.

"Q. Okay. That's fine. That's what I kind of thought the result would be. Now, you indicated there was an increase in value in properties in 1985. You also testified you heard the testimony this morning of Mr. Sjostrom that that market peaked in 1988. Do you agree with that?

"A. No.

"Q. And when do you think the market peaked?

"A. I did a month-by-month study of all the sales in Wethersfield from the period of early 1988 through early 1990, and it peaked in March of 1989, to be exact.

"Q. So it was going down when we get to October of 1989.

"A. It was pretty flat that summer. It just started the downward trend in the latter part near October of 1989; that's correct.

The trial court did not find the fair market value of the plaintiff's expert or his view of the highest and best use of the land to be worthy of acceptance, and it,

"Q. And in those—in your experience, in looking at undeveloped land, when did that peak?

"A. I would say about the same time.

"Q. Do you have any records that would inform the court of that, that you've maintained, and you personally have indicated?

\* \* \*

"A. . . . The valuation of the—base valuation of land in Wethersfield has remained pretty constant right through, you know, to September of 1990. And there are still residential subdivisions being built in Wethersfield."

The only other testimony of the assessor as to the value of building lots in terms of comparables was as follows: "I've looked at each parcel as an individual parcel, whether or not [the plaintiff] owned all of them or anybody else owned all of them. They're each individual parcels. We had lot sales in Wethersfield in that time period, even in lesser neighborhoods in excess of $130,000 each, and going up to $190,000 for a one-half acre lot in Wethersfield at point in time."

On redirect examination, the defendant's assessor testified as follows:

"Q. Mr. Dagata, among the three recognized methods of appraisal, what method did you employ in evaluating Ireland Estates as of October, 1989?

"A. In a broad sense, we use the comparable sales approach.

"Q. All right. In what period did you look at for comparables?

"A. 1987 right up until mid 1989.

"Q. All right. And did you look at individual lot sales?

"A. Yes.

"Q. Did you do that because you were appraising individual lots?

"A. Yes.

"Q. If you can look, Mr. Dagata, at plaintiff's exhibit C, which, I believe, is in front of you, what's the range of sizes of the lots that make up Ireland Estates?

"A. Okay. They're not indicated on here, but to the best of my recollection, they average around a one-half acre, plus or minus, most of them plus. That would be on—I can give it to you exactly, because they're on the property records.

"Q. Take a look at those, and I don't need the exact for each one, but if you can give us an idea as to the size of these parcels.

"A. Okay. It looks like a range of one-half acre to eight tenths of an acre, some of them at sixty-five hundredths and some of them at three quarters of an acre.

"Q. Now, Mr. Dagata, in your review of comparables and for purposes of evaluating Ireland Estates and other properties, how many land sales did you review for the period that you've described of lots in the one-half an acre to eight tenths of an acre range?"

The plaintiff objected to this question and the defendant's eliciting of any further testimony from the assessor as to specific comparables. The defendant then withdrew the question.

therefore, could properly reject that expert's opinion. The court, however, was then left without sufficient evidence to determine whether the assessment of the town would result in the payment of an unjust tax.[6] If an appeal is taken from a judgment that is based on a trial court's finding of true and actual value, which finding is not based on evidence that can form the basis for such a finding, there must be a new trial. See *Burritt*

---

[6] The court, in sustaining the plaintiff's objection to any further testimony of the defendant's assessor on redirect examination to expand on his statement on cross-examination that he could not identify one comparable in making his judgment as to value, noted as follows:

"The Court: The purpose of this hearing is to afford the court with enough information to make some determination on the value of the property as of October 1, 1989. And I've heard some testimony. I'm not prepared to review what I have heard until I've heard all of the evidence, and have had an opportunity to hear argument of counsel. But this case presents a substantial problem for the court. And being able to analyze and to determine what the factors are that go into making up the value of this case. You're technically correct, Mr. Heagney [plaintiff's counsel], that, from our strict procedural rules, that we have a direct examination, and then the cross-examination, and the redirect limited to the area of the cross. And the witness did not go into the comparables on direct examination. And, I gather, Mr. Callahan [defense counsel] is now seeking to have him go into those comparables. It seems that comparables, whether they come in from the plaintiff's appraiser, or the defendant's appraiser, are certainly factors for the court to consider. But we do have certain rules and procedure. So if you raise as an objection, I will sustain the objection."

"Mr. Callahan: Well, Your Honor, if I may be heard on the objection.

"The Court: Yes.

"Mr. Callahan: Well, I think what happened on direct is I did ask Mr. Dagata how these properties were evaluated. On cross, Mr. Heagney attacked the way in which Mr. Dagata valued the properties. What I am attempting to do now is, you know, discuss that issue. As an offer of proof, you know, Mr. Heagney attempted to cast the shadow of a doubt over Mr. Dagata's evaluation, because he couldn't name the comparables. What I'm trying to demonstrate to Your Honor, as the finder of facts, as an offer of proof, what he did.

"The Court: Well, but I do recall, at least on the direct examination, the witness did not go into the comparables. And my memory doesn't serve me that well, but it seems to me that there were—in the reevaluation, that wasn't necessarily the assessor that did the field work, and I'm not sure that—well, he did not testify to specific comparables, and now it's coming out . . . ."

*Mutual Savings Bank* v. *New Britain*, supra, 146 Conn. 680–81; *Grossomanides* v. *Wethersfield*, supra, 33 Conn. App. 517.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.