XEROX CORPORATION *v.* BOARD OF TAX REVIEW
OF THE CITY OF HARTFORD
(15456)

Callahan, C. J., and Berdon, Norcott, Palmer and Peters, Js.

Argued December 3, 1996—officially released March 18, 1997

*Robert P. Dolian,* with whom were *Roseanne C. Baxter* and, on the brief, *William H. Narwold,* for the appellant (plaintiff).

*Michael C. Collins,* deputy corporation counsel, with whom, on the brief, was *Kevin G. Dubay,* corporation counsel, for the appellee (defendant).

*Joseph F. Brennan* and *Stephen Ostrach* filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Opinion*

CALLAHAN, C. J. The dispositive issue in this appeal is whether the trial court properly dismissed the plaintiff Xerox Corporation's appeal from personal property tax assessments for the tax years 1990 through 1994 on the ground that the plaintiff had failed to provide the Hartford tax assessor (assessor) with sufficient information when it filed its tax lists. We conclude that the plaintiff provided the assessor with sufficient information, and, therefore, that the trial court should have conducted a de novo review to determine the value of the plaintiff's property for assessment purposes. Because it failed to do so, we reverse the court's judgment and order a new trial.

The relevant facts and procedural history are as follows. The plaintiff manufactures office equipment and distributes its products in the city of Hartford and throughout the country through both outright sales and leasing. Because the plaintiff retains ownership of the equipment that it leases in Hartford, it is required to file a list of its personal property for assessment pur-

poses with the assessor pursuant to General Statutes §§ 12-43[1] and 12-42.[2] General Statutes § 12-62a (b) requires each municipality to "assess all property . . . at a uniform rate of seventy per cent of present true and actual value, as determined under section 12-63." General Statutes § 12-63[3] provides that the present true

[1] General Statutes § 12-43 provides in relevant part: "Property of nonresidents. *All owners of real estate, or of tangible personal property located in any town* for three months or more during the assessment year immediately preceding any assessment day, who are nonresidents of such town, *shall file lists of such real estate and personal property with the assessors of the town* in which the same is located on such assessment day, if located in such town for three months or more in such year, otherwise, in the town in which such property is located for the three months or more in such year nearest to such assessment day, under the same provisions as apply to residents, and such personal property shall not be liable to taxation in any other town in this state. *The list of each nonresident taxpayer shall contain his post-office and street address. The assessors shall mail to each nonresident,* or to his attorney or agent having custody of his taxable property, at least fifteen days before the expiration of the time for filing lists, *blank forms for filing lists of such property. . . .*" (Emphasis added.)

[2] General Statutes § 12-42 provides in relevant part: "Time for giving in tax lists . . . penalty for failure to file. Each resident of any town liable to give in a list and pay taxes therein shall, except as otherwise specially provided by law, on or before the first day of November, annually, give in his list, made as prescribed by law, making a separate description of each parcel of real estate. . . . If he fails to file such list, the assessors shall fill out a list for him, putting therein all property which they have reason to believe is owned by him, liable to taxation, at the percentage of its actual valuation, as determined by the assessors in accordance with the provisions of sections 12-64 and 12-71, from the best information they can obtain, and add thereto twenty-five per cent of such assessment and in such list they shall make a separate description and assessment of each parcel of real estate. . . ."

[3] General Statutes (Rev. to 1995) § 12-63 provides: "Rule of valuation. The present true and actual value of land classified as farm land pursuant to section 12-107c, as forest land pursuant to section 12-107d, or as open space land pursuant to section 12-107e shall be based upon its current use without regard to neighborhood land use of a more intensive nature, provided in no event shall the present true and actual value of open space land be less than it would be if such open space land comprised a part of a tract or tracts of land classified as farm land pursuant to section 12-107c. *The present true and actual value of all other property shall be deemed by all assessors and boards of tax review to be the fair market value thereof and not its value at a forced or auction sale.*" (Emphasis added.) Section 12-63 was

and actual value of property is its fair market value.[4]

In 1978, the plaintiff argued in *Xerox Corp.* v. *Board of Tax Review*, 175 Conn. 301, 303, 397 A.2d 1367 (1978), that the income capitalization method of valuation was the proper method for determining the fair market value of its leased equipment in Hartford.[5] At that time, the assessor's method of determining the fair market value of the plaintiff's leased equipment involved applying a fixed rate of depreciation, depending on the age of the equipment, to the published list price for each type and model of the plaintiff's equipment. Id., 303. The trial court in that case found as a fact that during the tax years then at issue the plaintiff never sold any of its products within the state of Connecticut for less than the published list price, which was fixed and maintained by the plaintiff. Id., 305. After noting that the fair market value of property is the price that would result from fair negotiations between a willing seller and a willing buyer, we concluded that, under the circumstances, the assessor's method of valuing the plaintiff's equipment was proper. Id., 305–306.

Since our decision in *Xerox Corp.* v. *Board of Tax Review*, supra, 175 Conn. 301, the plaintiff and the assessor have agreed on the methodology for determining the fair market value of the plaintiff's leased equipment in Hartford—specifically, a fixed rate of depreciation, depending on the age of the equipment, is applied to the actual retail selling price of the plaintiff's equipment

amended by Public Acts 1996, No. 96-171, replacing the reference to boards of tax review with a reference to boards of assessment appeals.

[1] The plaintiff is required, pursuant to General Statutes § 12-71, to pay a personal property tax to the city of Hartford on all personal property owned and leased by the plaintiff within the city.

[5] The income capitalization method of valuation then urged by the plaintiff involved obtaining revenue and expense figures from the actual lease arrangements, and capitalizing those figures to obtain values for each piece of leased equipment.

when new.[6] That is, the starting point for the determination of the value of each piece of the plaintiff's leased equipment is the price that a buyer would have to pay in the market to purchase the same piece of equipment. The plaintiff and the assessor disagree, however, on how to determine the actual retail selling price of the plaintiff's products from 1990 through 1994. The plaintiff claims that the marketplace has changed dramatically since the decision in *Xerox Corp.* because of competition, and that currently it never sells its equipment for the published list price but always for a price significantly below the list price.[7] As a result of this change in the marketplace, the plaintiff claims that the assessor's use of the plaintiff's published list prices as the starting point for the determination of the value of the plaintiff's leased equipment overvalues the equipment, which naturally results in an overassessment.

The record reveals that in 1982 the plaintiff began to study data collected from its financial records to determine the actual retail selling prices of its equipment. In its initial phases, the study accounted for only actual cash discounts given off the list prices to determine the actual selling prices. The plaintiff calculated the average discount on its products by totaling the actual selling prices of the equipment it sold, and dividing that figure by the total list prices for the same equipment. The result was a weighted average discount

---

[6] Since the mid-1980s, the plaintiff and the assessor have also agreed on the depreciation schedule to be applied to the plaintiff's equipment.

[7] The plaintiff claims that it currently competes with five or six other companies for business, all of which offer substantial discounts from the published list prices on sales of their equipment. Accordingly, the plaintiff now permits its sales representatives to give customers discounts from its published list prices. On the basis of costs, history, competition, and preset target and minimum prices, the plaintiff's sales representatives negotiate the price to meet the market conditions. The plaintiff's sales information is reported nationally, via a computer database, and a discount range, commonly 20 to 30 percent below the list price, is set throughout the United States.

accounting for every sale of the plaintiff's equipment in the United States.[8] The plaintiff compiled the market data every twelve months. In the late 1980s, the plaintiff began adding noncash discounts into the computation of the national average discount on its products.[9] The data reflecting noncash discounts were retrieved from the same financial records that contained the list prices and actual retail selling prices of the plaintiff's equipment.[10] The results of this study were compiled in an "effective price study" that totaled cash discounts and noncash discounts to determine an average weighted annual discount based on sales in the United States of all the plaintiff's equipment for the preceding twelve month period.

For the 1990 tax year, the plaintiff submitted a personal property tax list to the assessor in which it deter-

[8] For example, if the plaintiff sold two pieces of equipment nationwide—the first piece of equipment, with a list price of $1000, sold for $700, after accounting for cash and noncash discounts, and the second piece of equipment, with a list price of $100,000, sold for $90,000, after accounting for cash and noncash discounts—the computation of the national weighted average discount would be as follows: First, the list prices of the two pieces of equipment would be added to arrive at a total list price of $101,000 ($100,000 + $1000 = $101,000). Next, the actual selling prices of the two pieces of equipment would be added to arrive at a total actual selling price of $90,700 ($90,000 + $700 = $90,700). Finally, the total actual retail selling price would be divided by the total list price to arrive at a percentage of 89.8 percent ($90,700 ÷ $101,000 = .898 percent), which is equivalent to a weighted average percentage of the list price for which the equipment sold. In other words, the weighted average discount on the two pieces of equipment was 10.2 percent (100 percent - 89.8 percent = 10.2 percent). The $100,000 piece of equipment receives more weight through this method of computing averages because it constitutes more of the total list price and total actual retail selling price than the $1000 piece of equipment.

[9] Noncash discounts were discounts given to the customer in a form other than cash, such as below market financing, free services, prepayment of monthly invoice charges. free training classes, and bonus goods.

[10] The plaintiff claimed that its financial division assigned to noncash discounts values based on published list prices and other factors. For example, if the published list price for one month of free service was $400, and a sales representative struck a deal with a customer whereby the customer would receive one month of free service, the value of $400 was assigned

mined the actual market value, or "full value," of its equipment when new by applying the total average weighted discount from the "effective price study" to the published list prices of its leased equipment in Hartford. On its 1990 list, the plaintiff asserted that the "full value" of its leased equipment in Hartford was $16,742,737, and that the "net value" of its equipment, after the depreciation schedule was applied, was $10,274,058. Along with the 1990 list, the plaintiff submitted a letter, addressed to all Connecticut assessors, summarizing and explaining the "effective price study" and the meaning of the terms "full value" and "net value." The plaintiff also submitted charts that compared the list price for equipment models with the "effective price," which was the actual cash price paid by customers, for the same models. The charts accounted for the percentage discount, or difference, between the list price and actual sales price, weighted by activity. According to the charts, the average cash discount from the list price on the plaintiff's equipment sold in the United States was 17 percent. In addition, the plaintiff submitted a description of the noncash discounts given on the equipment it sold in the United States.[11] The plaintiff submitted a chart that summarized the noncash discounts given throughout the year and calculated the total average noncash discount on its equipment to be 14 percent. The plaintiff applied a total 31 percent discount to the list prices of its leased equipment in Hartford, arriving at what it considered the fair market value of that equipment when new, by adding together the 17 percent national average cash discount and the 14 percent national average noncash discount.[12]

as a noncash discount on that particular sale. In determining the actual retail selling price of the plaintiff's equipment, the engineers of the effective price study subtracted the $400 value for the free service from the actual cash amount paid for the equipment.

[11] See footnote 9.

[12] Each of these averages was a weighted average that accounted for every sale of the plaintiff's equipment in the United States. See footnote 8.

The assessor did not accept the plaintiff's valuation of its equipment for 1990. After learning that the plaintiff had applied a 31 percent discount to its list prices to obtain what it termed the "full value" of its equipment, the assessor added the 31 percent discount back into the "net value" figure asserted by the plaintiff, thus restoring the list prices, to obtain a total fair market valuation of the plaintiff's equipment, less depreciation, of $14,670,768, some $4,396,710 more than the "net value" placed on the equipment by the plaintiff.[13] The plaintiff appealed the 1990 assessment, pursuant to General Statutes § 12-111,[14] to the defendant board of tax review for the city of Hartford (board), which refused to change the assessments. The plaintiff then appealed to the Superior Court, pursuant to General

---

[13] In addition, the assessor made additions and subtractions to the "full value" and "net value" figures asserted by the plaintiff to account for equipment that the plaintiff should have, but did not, include in its property list, and equipment that the plaintiff incorrectly included in its list. The plaintiff never disputed the additions and subtractions.

[14] General Statutes (Rev. to 1995) § 12-111 provides in relevant part: "Appeals to board of tax review. At such meeting any person . . . claiming to be aggrieved by the doings of the assessors of such town may appeal therefrom to such board of tax review, which shall determine all such appeals and report in writing the final determination of such appeals to each such person within one week after such determination has been made. Such board may equalize and adjust the valuations and assessment lists of such town and may increase the items of taxable property in the list of any person, or the number, quantity or amount of any such item, or add to any such list any taxable property or interest therein omitted by the assessors which should be added thereto . . . but, before proceeding to increase the list of any person or to add to the assessment list the name of any person so omitted, it shall mail to him, postage paid, at least one week before making such increase or addition, a written or printed notice addressed to him at the town in which he resides, to appear before such board and show cause why such increase or addition should not be made."

The legislature amended § 12-111 in 1995 by enacting Public Acts 1995, No. 95-283, § 50, which made changes concerning filing and notice procedures. At that time, references to the board of tax review in the pre1995 version were changed to the board of assessment appeals. Section 12-111 was further amended in 1996 by Public Acts 1996, No. 96-171, concerning notification of the determination of such appeals.

Statutes §§ 12-118[15] and 12-117a.[16] The plaintiff later amended its complaint to include in its appeal its personal property tax assessments for the years 1991 through 1994.[17]

[15] The version of § 12-118 in effect when the plaintiff appealed to the Superior Court provided in relevant part: "Appeals from Connecticut Appeals Board for Property Valuation. Any person . . . claiming to be aggrieved by the findings or determinations of the Connecticut Appeals Board for Property Valuation may, within two months from the time of such action, make application, in the nature of an appeal therefrom, to the superior court for the judicial district which includes the town or city in which the property constituting the subject of such appeal is situated . . . . *The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable* . . . ." (Emphasis added.)

The legislature had amended § 12-118 in 1987 by substituting "findings or determinations of the Connecticut Appeals Board for Property Valuation" for "action of the board of tax review in any town or city." Public Acts 1987, No. 87-404, § 9. In 1989, the legislature moved the provisions of § 12-118, allowing for an appeal to the Superior Court from actions of local boards of tax review, to § 12-117a. *First Bethel Associates* v. *Bethel*, 231 Conn. 731, 734 n.2, 651 A.2d 1279 (1995). Therefore, our case law interpreting § 12-118 is applicable to § 12-117a. The legislature eventually repealed General Statutes §§ 12-118, 12-121aa, and 12-121bb, concerning the creation and operation of the Connecticut appeals board for property valuation, effective July 6, 1995. Public Acts 1995, No. 95-283, § 67.

[16] The version of § 12-117a in effect when the plaintiff appealed to the Superior Court provided in relevant part: "Notwithstanding the provisions of sections 12-118, 12-121aa and 12-121bb, any person . . . claiming to be aggrieved by the action of the board of tax review in any town or city with respect to the assessment list for the assessment year commencing October 1, 1989, or October 1, 1990, may, within two months from the time of such action, make application, in the nature of an appeal therefrom, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. . . . *The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable* . . . ." (Emphasis added.) See Public Acts 1990, No. 90-266, § 4.

[17] The plaintiff computed the net value of its Hartford property on the lists it submitted for those tax years by using the same method it utilized for its 1990 list. The plaintiff applied an average weighted discount of 33 percent to the equipment listed on the 1991 grand list, 34.1 percent to that on the 1992 grand list, 28 percent to that on the 1993 grand list, and 27 percent to that on the 1994 grand list. During those tax years also, the

On June 8 and 9, 1995, the Superior Court heard evidence pertaining to the plaintiff's appeal.[18] The plaintiff presented several witnesses whose testimony explained the nature of the plaintiff's business and the methodologies and processes that the plaintiff used in compiling its personal property tax lists for the tax years at issue. The plaintiff also presented two expert witnesses who testified to the validity among appraisal experts of the valuation methodologies used by the plaintiff in its effective price study and in calculating fair market value on its tax lists. Finally, the plaintiff submitted various items of documentary evidence to support its valuation claim, and the deposition of one of its employees, Rosemary Ciaschi, who testified that she never sold the plaintiff's products to a commercial customer for the published list price. Ciaschi testified in her deposition that the typical discount given to commercial customers on the plaintiff's products ranged from 10 to 40 percent.

In response, the defendant presented two witnesses, Richard K. Wandy and Joseph Dakers, Sr., respectively the former and present chief assessment technicians responsible for the city of Hartford's personal property tax list. The bulk of the testimony provided by Wandy and Dakers concerned the quantum of information that the plaintiff had provided or had failed to provide to the assessor to support its claimed valuation of the property. The thrust of their testimony was that the assessor had not accepted the plaintiff's estimates of

assessor did not accept the plaintiff's method of calculating the fair market value of its equipment, and continued to determine the value of the plaintiff's equipment by using the plaintiff's published list prices for new equipment, less depreciation.

[18] Although we find it necessary for the resolution of this appeal to detail some of the evidence presented at trial, we stress that our recitation of the evidence should not be construed as a comment on the sufficiency or credibility of the evidence concerning market value.

fair market value because the plaintiff had not provided the assessor with the raw data—for example, sales invoices and other documentation—used in the effective price study to determine the national average cash and noncash discounts. Although they acknowledged that the effective price study was a national study that reflected sales of approximately $1,084,120,683, they testified that the plaintiff should have provided the assessor with sales documentation for sales within the city of Hartford, or within the state of Connecticut. Although they asserted that such information would have aided them in substantiating the plaintiff's estimates of fair market value, they testified that during their respective tenures, the assessor had never made a formal written request that the plaintiff provide such information.

In addition, both Wandy and Dakers testified that the plaintiff had failed to provide the assessor with certain information requested on the back of the assessment form sent to the plaintiff, specifically the start and end dates of the leases and the monthly contract rent on the plaintiff's equipment in Hartford.[19] Wandy testified that he had sent a letter to the plaintiff in 1992 requesting that the plaintiff supply the lease information requested on the back of the form.[20] He testified that he had sought this information in order to double check the plaintiff's

[19] The back of the assessment form requested nine different types of information with respect to each piece of leased equipment. With the exception of the lease start and end dates and the monthly contract rent, the plaintiff provided the assessor with all of the requested information on a form it submitted to the assessor called the "property tax detail list."

[20] The letter stated in relevant part: "In reviewing Xerox's personal property return for 1992 I have discovered that you have once again elected to ignore providing material information requested on our declaration. I view Xerox's repeated failure to file requested information as a serious matter. In order to avoid the potential for serious consequences I would strongly advise you to refile using the format outlined on the reverse side of our declaration. If you wish to provide additional information over and above that which is requested, feel free to do so."

estimates of fair market value.[21] In a letter sent to the assessor in response to the assessor's 1992 letter, the plaintiff stated that the lease start and end dates and monthly contract rent information was not "available in the normal course of business" because it was not contained in the plaintiff's "headquarters equipment control database." Oscar Holloway, the plaintiff's manager of compliance and audit,[22] testified that, in order to retrieve this information, the plaintiff would have had to go to each separate lessee's customer file to obtain information from the individual leases. The plaintiff's 1992 letter further stated: "It is Xerox' understanding this information is not used by the Assessor for valuation purposes and therefore would not impact the Assessor's valuation process."[23] The record does not reveal a response to the plaintiff's letter.

After trial, the court dismissed the plaintiff's appeal, concluding that "the plaintiff did not provide the assessor with sufficient information to support its claimed discount." The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred its appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

This appeal raises the issue of how much information a taxpayer must provide to an assessor in order to

[21] Wandy testified that, if he had been supplied with the lease start and end dates and monthly contract rent information, he would have compared the rental streams flowing from the lessees to the plaintiff with the plaintiff's estimates of value to see whether a correlation existed. See footnote 5. He testified on cross-examination, however, that the assessor's preferred method of valuing leased equipment such as that of the plaintiff remained the price new less depreciation method advocated by the assessor in *Xerox Corp.* v. *Board of Tax Review,* supra, 175 Conn. 301, and adhered to up until the present, and that the plaintiff had provided the assessor with sufficient information to perform its preferred method of valuation.

[22] Holloway was responsible for, among other things, the filing of the plaintiff's personal property tax returns throughout the United States.

[23] See footnote 21.

obtain a de novo judicial review of an assessment in the Superior Court. See *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 103–104, 626 A.2d 1292 (1993) (taxpayer entitled to de novo review of assessment by Superior Court). We conclude that the plaintiff provided the assessor with sufficient information to entitle it to a de novo judicial review of the assessor's valuation and resulting tax assessment, and that the trial court improperly dismissed the plaintiff's appeal without performing the required review.

It is undisputed that, in an appeal pursuant to § 12-117a,[24] the trial court "tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property." (Internal quotation marks omitted.) *Newbury Commons Ltd. Partnership* v. *Stamford*, supra, 226 Conn. 104; *O'Brien* v. *Board of Tax Review*, 169 Conn. 129, 130–31, 362 A.2d 914 (1975). At the de novo proceeding, the taxpayer bears the burden of establishing that the assessor has overassessed its property. *New Haven Water Co.* v. *Board of Tax Review*, 166 Conn. 232, 234, 348 A.2d 641 (1974); see also *Stamford Apartments Co.* v. *Stamford*, 203 Conn. 586, 590, 525 A.2d 1327 (1987); *Burritt Mutual Savings Bank* v. *New Britain*, 146 Conn. 669, 675, 154 A.2d 608 (1959). The trier of fact must arrive "at his own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value . . . ." (Internal quotation marks omitted.) *Newbury Commons Ltd. Partnership* v. *Stamford*, supra, 105; *O'Brien* v. *Board of Tax Review*, supra, 136.

It is also undisputed, however, that the taxpayer bears the burden of supplying certain information to the

---

[24] Although the cases cite § 12-118, the legislature recodified the provisions of § 12-118 as § 12-117a in 1989. See footnotes 15 and 16.

assessor before the taxpayer is entitled to a de novo judicial review of a tax assessment. We have formulated that duty as follows: "It is the duty of each taxpayer, as a personal obligation, to file with the assessors a list of his taxable property and *furnish the facts upon which valuations may be based.* . . . If he fails to do so, the assessors are only required to act upon the best information [they] can obtain . . . and the taxpayer cannot justly complain if the assessors, acting in good faith, make an error in judgment in listing and valuing his property." (Citations omitted; emphasis added; internal quotation marks omitted.) *Northeast Datacom, Inc.* v. *Wallingford*, 212 Conn. 639, 649, 563 A.2d 688 (1989), quoting *Cooley Chevrolet Co.* v. *West Haven*, 146 Conn. 165, 169, 148 A.2d 327 (1959).

On occasion, we have affirmed decisions dismissing taxpayer appeals because the taxpayer failed to provide the assessor with sufficient information. See *IBM Credit Corp.* v. *Board of Tax Review*, 227 Conn. 826, 829, 633 A.2d 294 (1993) (taxpayer cannot contest, in Superior Court, assessor's use of certain depreciation schedule for property valuation where taxpayer never provided assessor with alternative depreciation schedule); *Northeast Datacom, Inc.* v. *Wallingford*, supra, 212 Conn. 647–49 (taxpayer cannot contest assessment in Superior Court where taxpayer failed to file list of taxable property). The defendant argues, primarily on the basis of *IBM Credit Corp.* and *Northeast Datacom, Inc.*, that the trial court properly dismissed the plaintiff's appeal without deciding the valuation issue because the plaintiff failed to satisfy its burden of furnishing "the facts upon which valuations may be based" when it failed to provide the assessor with the lease start and end dates, monthly contract rent, and a sampling of the raw data used in the effective price study. We disagree.

In our view, the plaintiff satisfied its burden of providing "the facts upon which valuations may be based," thereby triggering its right to a de novo judicial review of the valuation and tax assessment, by submitting to the assessor a list of its taxable personal property with estimates of the fair market value of that property computed according to the plaintiff's valuation methodology.[25] The plaintiff's only statutory obligation, pursuant to § 12-43, was to file a list of its personal property containing its post office and street addresses. See footnote 1. In addition, we believe *IBM Credit Corp.* v. *Board of Tax Review*, supra, 227 Conn. 827–29, requires the taxpayer to submit to the assessor its own estimate of fair market value, computed according to the valuation methodology the taxpayer believes appropriate, in order to secure de novo review in the Superior Court of the assessor's valuation and resulting assessment. In *IBM Credit Corp.* v. *Board of Tax Review*, supra, 827, the taxpayer filed a list of its personal property, with estimates of the fair market value of that property, utilizing the depreciation schedule on the back of the assessment form. The assessor accepted the taxpayer's estimates of fair market value and assessed the taxpayer's property on the basis of those estimates. Id., 827. The taxpayer later argued, however, that the depreciation schedule on the back of the assessment form did not accurately reflect the fair market value of two pieces of equipment, resulting in an overassessment. Id., 828. We affirmed the trial court's dismissal of the taxpayer's appeal because the taxpayer had failed to alert the assessor, when it filed its tax list, of its view that the depreciation schedule on the back of the form was inappropriate for certain pieces of its equipment. Id., 828–29. We concluded that the taxpayer could not challenge the assessor's valuation and assessment in the

---

[25] We note that the propriety of the plaintiff's valuation methodology is not before us and is a question that will have to be reviewed in the new trial.

Superior Court because the assessor had accepted the estimates of fair market value that the taxpayer had provided. Id., 827–29.

In the present case, the plaintiff satisfied its statutory obligations, as well as its obligations under *IBM Credit Corp.* and *Northeast Datacom, Inc.*, by submitting to the assessor a list of its taxable personal property with estimates of the fair market value of that property computed according to what it believed to be the appropriate valuation methodology. In addition, the plaintiff provided the assessor with a summary of its effective price study, describing the methodology it used to compute the values on its list, as well as charts that listed and totaled the national average cash and noncash discounts given on each different equipment model throughout the year. The distinguishing feature between the present case and *IBM Credit Corp.* is that, in the present case, the assessor did not accept the estimates of fair market value provided by the taxpayer. The assessor's decision not to accept the plaintiff's estimates of fair market value does not, however, affect the plaintiff's right to a de novo judicial review of the valuation and assessment. The plaintiff, in effect, avoided the pitfall of *IBM Credit Corp.* by providing the assessor, in the first instance, with an estimate of fair market value computed according to its methodology, rather than waiting until after the assessment to challenge the assessor's methodology and assert its own.

The defendant argues that, by failing to provide the assessor with the lease start and end dates, monthly contract rent, and raw data used in the effective price study, the plaintiff was able "to establish its own tax burden without a real possibility of contradiction." We disagree. The assessor possessed statutory authority to compel the plaintiff to produce such information if it was deemed necessary, but failed to use that authority.

General Statutes § 12-53[26] requires taxpayers, upon written notice by the assessor, to appear at a hearing before the assessor "with books of account, papers, documents and other records for examination under oath relative to" the valuation of any property, whenever "the assessor . . . [is] unable to determine the value of any property without the assistance of the owner . . . ." The assessor, however, never made a request for information, pursuant to § 12-53, or provided the plaintiff with the notice required thereby.[27] See footnote 26. Accord-

---

[26] General Statutes § 12-53 provides in relevant part: "Addition of omitted property to list . . . .

"(b) If the assessor or board of assessors of any town believe that taxable property has been omitted from the list given in by any person or that taxable property belongs to any person who has not given in a list, *or if the assessor or board of assessors are unable to determine the value of any property without the assistance of the owner, custodian or other person having knowledge of the same, they may give notice in writing to the owner, custodian or other person having knowledge of any such property or the valuation thereof, of the time and place of a hearing with respect thereto.* . . . *Such notice shall direct the person named therein to appear before the assessor or board of assessors with books of account, papers, documents and other records for examination under oath relative to any such property or the valuation thereof.* . . . *No person shall be excused from giving testimony or producing books of account, papers, documents and other records* on the ground that such testimony and such production of documents will tend to incriminate him, but such testimony and such production of documentary evidence shall not be used in any criminal proceeding against him. *Any person who fails to appear at the time and place of such hearing in such notice designated or at any adjournment thereof, or, having appeared, refuses to answer any pertinent question put to him or who fails to produce the books, papers or other documents mentioned in such notice, shall be fined not more than one hundred dollars or imprisoned not more than thirty days or both.* All property which the assessor or board of assessors believes should have been listed for taxation and was not listed and concerning which sufficient information cannot be obtained by them at such hearing, or any adjournment thereof, shall be added to the list at such percentage of the actual valuation thereof from the best information obtainable by the assessor or board of assessors and twenty-five per cent shall be added to such assessment." (Emphasis added.)

[27] We do not view the assessor's 1992 letter requesting that the plaintiff supply the information sought on the back of the assessment form as an invocation of § 12-53. See footnotes 20 and 26. In this regard, we note that, although our statutes empower the assessor to require taxpayers to provide

ingly, we need not decide what effect a taxpayer's refusal to comply with a request pursuant to § 12-53 might have on the scope of the Superior Court's review of an appeal.

In addition, we note that, before the board may reduce a taxpayer's list, General Statutes § 12-113[28] requires the taxpayer to appear before the board and "offer or consent to be sworn before it and answer all questions touching his taxable property situated in the town."[29] Moreover, once the plaintiff appealed to the Superior Court, the board was afforded all the traditional discovery rights and document production rights possessed by civil litigants. In our view, the assessor had an opportunity to challenge the plaintiff's methodologies and computations and to require the plaintiff to produce information relative to value at each stage of the assessment process. The assessor's failure to take advantage of those opportunities does not foil the plain-

---

rental income and expense information with respect to rental income *real property*; see General Statutes §§ 12-63b and 12-63c; we have found no similar statutory provisions providing the assessor with such authority with respect to *personal property*. We do not believe, therefore, that the plaintiff's failure to provide the assessor with two of the nine types of information requested on the back of the assessment form affected the plaintiff's right to a de novo review by the Superior Court of the valuation and assessment. See footnote 19.

[28] General Statutes § 12-113 provides in relevant part: "When board . . . may reduce lists. The board . . . may reduce the list of any person by reducing the valuation, number, quantity or amount of any item of estate therein, or by deleting any item which ought not to be retained in it, provided any such reduction or deletion shall be made by drawing a single line through the item in the list to be reduced or deleted and in the case of a reduction, the corresponding reduced amount shall be entered in such manner as to be clearly related to the item reduced. The board . . . shall not reduce the list of any person who does not appear, either in person or by his attorney or agent, and offer or consent to be sworn before it and answer all questions touching his taxable property situated in the town."

[29] We have no record before us of what transpired during the plaintiff's appearance before the board in the present case other than the representations made during oral argument by both the plaintiff and the defendant that the plaintiff appealed to, but obtained no relief from, the board.

tiff's right to a de novo judicial review of the valuation and assessment, given the quantum of information the plaintiff did present.

Because the plaintiff provided the assessor with sufficient information to obtain a de novo review of the assessor's valuation, the trial court should have determined, on the basis of the evidence before it, whether the plaintiff had met its burden of proving that the assessor had overvalued the plaintiff's property. See *Newbury Commons Ltd. Partnership* v. *Stamford*, supra, 226 Conn. 104; *O'Brien* v. *Board of Tax Review*, supra, 169 Conn. 130–31; *Hutensky* v. *Avon*, 163 Conn. 433, 436, 311 A.2d 92 (1972).

The judgment is reversed and the case is remanded for a new trial.[30]

In this opinion the other justices concurred.

---

[30] In its briefs and at oral argument, the plaintiff asks us to review the record and determine the fair market value of its leased equipment in Hartford. We decline the plaintiff's request. This court cannot try the facts or pass upon the credibility of witnesses. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 220, 435 A.2d 24 (1980); see also *Johnson* v. *Flammia*, 169 Conn. 491, 497, 363 A.2d 1048 (1975).