[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of Decision:
There are two issues in this real estate tax appeal The first issue is the valuation of the subject property called Seaport Marina located on the Mystic River near the center of the town of Mystic. The second issue is whether a nonattorney may solicit or induce another person to bring a tax appeal contingent on sharing in the recovery of overpaid taxes.
Seaport Marina is a boatyard containing 11.20 acres of land zoned Marine Commercial (MC-80). The subject is bounded on the north by Washington Street and on the west and south by the Mystic River. The boatyard operation is confined to the westerly half of the property along the Mystic River. The eastern portion of the subject property on Willow Street is undeveloped. There are six buildings on the land with a gross building area of 63,147 square feet. A large amount of the space is devoted to CT Page 2676 covered boat storage during the winter months. The storage buildings have dirt floors, no heat and minimal electrical service. There is a single family dwelling located at the northeast corner of the main boatyard site. The house, built in 1920, has 1162 square feet of living space.
The waterside improvements to the subject property consist of a marine railway, a travel slip, fixed piers and floating docks which provided for sixty-five slips, plus additional dock space for service and other boatyard activities.
The highest and best use of the subject property is for its continued use as a marina and boatyard. The Stonington assessor valued the property at $2,140,840 as of October 1, 1994, the date of the last town-wide revaluation.
The plaintiff's appraiser, Arnold J. Grant, used the income approach and the sales comparison approach to arrive at fair market value of $1,280,000 on October 1, 1994. This opinion of value was based on a finding of $1,260,000 using the income approach and $1,300,000 using the sales comparison approach.
The town's appraiser, Robert J. Flanagan, also used the income approach and the sales comparison approach to arrive at fair market value. Flanagan concluded that the fair market value of the subject property was $1,870,000 on October 1, 1994. This opinion was based on a finding of $1,819,000 using the sales comparison approach and $1,870,000 using the income approach.
In valuing marinas, the income approach is generally the most reliable method of arriving at value since most marinas are economic investments. Haddad, Nicholas S., Appraisal of Marinas, Encyclopedia of Real Estate Appraising (3d Ed. 1978), p. 881.
Basically, Grant's approach consisted of a survey of other marinas on what they charge per slip. From this survey, he arrived at a value which equals the market price per slip multiplied by the number of slips. As an example, Grant concluded from his survey of other marinas that the market for boat slips was $20,000 per slip. $20,000 multiplied by sixty five slips gave Grant a value of $1,300,000. Flanagan, on the other hand, surveyed the market for boat slips and concluded that $18,750 was the value per slip. Although the subject has sixty-five slips, Flanagan adjusted the number of slips upward by 50% to ninety seven slips, because the subject contains larger slips than the CT Page 2677 other marinas he surveyed. Flanagan multiplied the theoretical ninety-seven slips by $18,750 to arrive at a value of $1,819,000.
Flanagan's theory is that larger slips accommodating larger boats should be valued at a higher rate per slip. However, Flanagan's process of increasing the number of slips to account for the larger size of the slips is speculative at best. If the market dictates a higher per slip value for larger slips, comparable sales would reflect this difference between marina size slips and boatyard size slips. In this case we have no evidence of comparable sales of marinas with larger slips to assist us in accurately determining the effect of slip size upon.
We resolve this case by giving selective credibility to various computations and analyses used by Grant and Flanagan using the income approach. After reviewing the appraisal reports and testimony of both appraisers, we find that a reasonable effective projected gross income is $332,233. This projected gross income is derived from Flanagan's water component income of $146,250, Grant's dwelling component of $5,700, and Grant's landside component of $180,283. We deduct Grant's total operating expense of $172,765 minus the $35,000 Grant included for taxes to arrive at a total operating expense of $137,765. Deducting the total expense of $137,765 from the projected gross income of $332,233 results in a net operating income of $194,468.
We next use the capitalization rate of 11.60% as developed by Flanagan, which includes a factor for taxes, to arrive at a total value, using the direct capitalization of net operating income, of $1,676,448. We find the fair market value of the subject property to be $1,676,448 as of October 1, 1994.
The basis for the second issue in this case arises from the following facts. Thomas Merola, who is not a party to this action, operates a business known as Valuation Services. Merola solicits property owners to challenge the valuation of their properties by municipal assessors. Solicitation is done through the use of a brochure. Merola, as part of his service to a property owner will, for a fee, undertake to represent the property owner before the board of assessment appeals. If unsuccessful before the board, Merola will undertake to hire an appraiser and hire an attorney to prosecute an appeal from the board to the Superior Court. Merola pays for all costs of the appeal including court costs and sheriff's fees from the time that he appears before the board through the court proceedings. CT Page 2678 The property owner neither pays nor risks incurring any costs for the appeal. Merola charges a contingent fee for his services. If Merola is successful on behalf of the property owner, the property owner agrees to pay Merola one-third of any tax savings for a three year period. All of Merola's costs are incorporated within the one-third fee.
The town raises a special defense in this action that the plaintiff's action is barred as a violation of public policy in that Merola, not the property owner, is the real party in interest because of the contingent fee agreement, and that Merola, who is not an attorney, has improperly induced another to bring a cause of action in violation of General Statutes § 51-86.
General Statutes 51-86 provides:
 (a) A person who has not been admitted as an attorney in this state under the provisions of section 51-80 shall not solicit, advise, request or induce another person to cause an action for damages to be instituted, from which action or from which person the person soliciting, advising, or requesting or inducing the action may, by agreement or otherwise, directly or indirectly receive compensation from such other person or such person's attorney, or in which action the compensation of the attorney instituting or prosecuting the action, directly or indirectly, depends upon the amount of the recovery therein.
 (b) Any person who violates any provision of this section shall be fined not more than one hundred dollars or imprisoned not more than six months or both.
The town claims that Merola's actions described above violate General Statutes § 51-86. The town further claims that where the property owner, in this case the plaintiff, participates in the act that violates public policy, the property owner as a principal cannot benefit from his agent's acts, and therefore this action should be dismissed.
The plaintiff argues that General Statutes § 51-86 is based on a claim for damages, and that since appeals under general statutes § 12-117a are for reimbursement for overpayment of taxes, not damages, § 51-86 is inapplicable. The plaintiff also claims that Merola is not a party to this CT Page 2679 action and thus has had no opportunity to contest the claimed violation of § 51-86. Finally, the plaintiff claims that General Statutes § 51-86 only penalizes the person who induces another, not the party being induced.
A lay person who is a stranger to a case and enters into an agreement to prosecute the case for a share in the recovery is guilty of champerty and the agreement has been held void. 14 Am.Jur.2d Champerty and Maintenance § 3 (1993). This common law doctrine of champerty and maintenance, as applied to civil actions, has never been adopted in Connecticut, and the only test is whether a particular transaction is against public policy.Rice v. Farrell, 129 Conn. 362, 365, 28 A.2d 7 (1942); see Mallv. LaBow, 33 Conn. App. 359, 363, 635 A.2d 871 (1993). In Rice v.Farrell, the court refused to enforce an agreement between the property owner and the stranger to the transaction stating that "while a stranger to litigation may properly assist a poor person to assert his rights, such assistance is not permissible where the stranger is to share in the proceeds of the action. Restatement, 2 Contracts, 541; 11 C.J. 249, 36; 14 C.J.S. 368, 24. The agreement before us was one against public policy and therefore, as between the parties to it, unenforceable." Rice v.Farrell, supra, 129 Conn. 367. Rice v. Farrell stands for the proposition that although an agreement by a layman to prosecute a case on behalf of another for a fee is against public policy, the illegal agreement may not be used as a defense to a legitimate cause of action unrelated to the agreement. Id., 367; see alsoPerry v. Puklin Co., 100 Conn. 104, 123 A. 28 (1923). The court in Perry held: "[c]hamperty is not a defense to the obligation sued upon, since it is the champertous contract and not the right of action which is voidable at common law." Perry v. Puklin Co., supra, 100 Conn. 110.
In the present action Merola is not a party in the plaintiff's tax appeal. Merola's agreement with the plaintiff is that Merola will share in the proceeds of the action if his efforts are successful in obtaining a reduction in the plaintiff's taxes. While this arrangement, under the Rice test, may be violative of our public policy, thereby voiding the agreement between Merola and the plaintiff, this issue is not before us in this tax appeal. This tax appeal deals solely with the issue of the fair market value of the plaintiff's property on October 1, 1994. See Xerox Corp. v. Board of Tax Review,240 Conn. 192, 204, 690 A.2d 389 (1997). The town argues that because Merola was the agent of the plaintiff, the plaintiff a principal CT Page 2680 should be responsible for the agent's violation of public policy, and therefore should receive no tax reduction. However, as stated above, any actions by Merola which are allegedly violative of public policy are unrelated to the plaintiff's undisputed right to bring a tax appeal under General Statutes § 12-117a. Accordingly, we find that any alleged improper agreement entered into by the plaintiff and Merola does not bar the plaintiff's tax appeal seeking a reduction in the valuation of his property.
Other jurisdictions have addressed the issue of whether services similar to those rendered by Merola constitute the unauthorized practice of law. See, e.g. Annot., 9 A.L.R.2d 797 (1950); Crawford v. McConnell, 173 Okla. 520, 49 P.2d 551 (1935). It has long been the policy in this state for the Statewide Grievance Committee to police activities that may rise to the level of an unauthorized practice of law. See Statewide GrievanceCommittee v. Patton, 239 Conn. 251, 683 A.2d 1359 (1996);Statewide Grievance Committee v. Harris, 239 Conn. 256,683 A.2d 1363 (1996); Grievance Committee v. Dacey, 154 Conn. 129,222 A.2d 339 (1966); State Bar Ass'n v. Connecticut Bank Trust Co.,145 Conn. 222, 140 A.2d 863 (1958).
Merola is not a party to this action, and therefore is not subject to this court's jurisdiction. We cannot make determinations regarding the propriety of Merola's actions without giving Merola a full opportunity to respond to the defendant's claim that his actions encompass the unauthorized practice of law. The Statewide Grievance Committee is the appropriate entity to determine whether Merola's actions constituted the unauthorized practice of law so as to violate the public policy of this state. Accordingly, we decline to consider this issue as part of the present action.
Since we find that the subject property was overvalued as of October 1, 1994, judgment may enter sustaining the plaintiff's appeal without costs. The assessor is ordered to adjust the assessed value of the property to reflect a fair market value of $1,676,448 on the grand lists beginning with October 1, 1994.
Aronson, J.T.R.