[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, United Technologies Corporation, Hamilton Standard Division (UTC), appeals from the decision of the East Windsor Board of Assessment Appeals upholding the assessor's determination of the fair market value of UTC's After Market Support Facility (AMSF) located at 97 Newberry Road, East Windsor. On the revaluation date of October 1, 1995, the assessor determined that the fair market value of UTC's AMSF on Newberry Road was $22,236,770. UTC claims that the fair market value of the subject property as of October 1, 1995, was $13,825,000.
The subject property is located on the north side of Newberry Road, east of Route 5, in the northwest section of East Windsor. The subject CT Page 5378 property is accessible to Interstate 91 to the west and to Bradley International Airport located about 5 miles away in Windsor Locks. Route 5 is the primary commercial highway through East Windsor and provides access to Interstate 91 to the west and to Interstate 84 to the south. The subject property is located in an area which is primarily industrial. Seven major corporations have facilities in the neighborhood. The subject property is located in an M-1 zone which has a minimum lot size of 60, 000 square feet. A wide range of light industrial uses is permitted in this zone. The property contains 39.41 acres of land with access to Newberry Road through a strip of land with frontage of 200 feet. The property consists of a one story industrial building containing 278, 025 square feet of gross building area. 217, 455 square feet (78.2%) of the building contains the manufacturing area, and 60, 570 square feet (21.8%) of the building is devoted to an office area. The building also contains an interior 8000 square foot mezzanine in the manufacturing area. A 6480 square foot waste water treatment plant is located to the rear of the building. The Town has exempted this treatment plant for tax purposes. The manufacturing portion of the building has many special features, such as a chemical dispensing room, which is explosion proof, separation walls, a three hour fire rated wall, an electrical system of two 4000 amp facilities plus back up generators, a conduit line system, power plant, water storage tank, electronic service center, a floor drainage system to contain hazardous waste, a 25, 000 gallon double lined oil tank with leak detection devices, and an underground coolant storage tank. Other special features of the building include wall heights of 14 feet in the office area, and wall heights of over 26 feet with a 20 foot clear span in the manufacturing area. The manufacturing area is divided into smaller areas for engine component repair, jet fuel controls, propellor assembly, plating, blade machining, and a machine shop. There are areas in the manufacturing area with special interior finishes, including environmental control systems for a clean room with separate heating, ventilation and air conditioning system and electronic service center. Other special features include special drainage features for environmental control systems, a reinforced concrete floor with a heavy floor load, special explosion areas, and a paved parking lot of 250, 000 square feet to accommodate 700 cars.
The building and improvements were constructed as an AMSF, where UTC tests, repairs, and reconditions fuel injectors of jet aircraft engines and propellers for aircraft piston engines, manufactures testing equipment, and carries out ancillary administrative services related to these activities. The quality of the construction and the maintenance of this facility was exceptional, and the products used in the construction were of the highest quality. This manufacturing facility was constructed with such high quality that maintenance costs are at a minimum. This manufacturing plant was not the normal run-of-the-mill plant. CT Page 5379
Beckenstein Enterprises (Beckenstein) purchased the subject land on November 2, 1987, for $1,400,000, or $35,523 per acre. Beckenstein entered into a fifteen year lease with UTC on June 18, 1987. The lease provided that Beckenstein would construct a facility of approximately 275, 000 square feet in accordance with the plans and specifications of UTC. Beckenstein entered into an arrangement with UTC to construct the AMSF on a "fast track" basis to meet UTC's specifications. Beckenstein constructed the AMSF using UTC's plans and specifications and completed the construction in 1988. Beckenstein constructed the facility with funds provided by Prudential Insurance Company of America (Prudential). The subject premises, owned by Beckenstein, is subject to a mortgage in favor of Prudential in the principal sum of $26,000,000. This mortgage, executed on September 1, 1994, was a consolidation of various promissory notes. Since the mortgage securing the $26,000,000 was a non-recourse note, the only security for the loan was the subject real estate.
UTC took occupancy under the lease with Beckenstein in 1989. The lease is a modified triple net lease requiring UTC to be responsible for all operating expenses, including taxes. However, Beckenstein is responsible for insurance and structural repairs. The initial rent was based on the cost of construction, including change orders for the first five years. The lease also provided for an adjustment of the rent during the balance of the fifteen year lease based upon the mortgage to Prudential. In 1994, Beckenstein and UTC negotiated a fifth amendment to the lease. This fifth amendment provided for an annual rent of $4,251,687 for the then remaining 10 years on the lease. The fifth amendment of the lease gave UTC an option to purchase the property for $25,344,000 or on a mutually agreed upon price at the termination of the lease, or a right of first refusal. The lease provided for two ten year renewal options. On the revaluation date of October 1, 1995, the lease was in full force and effect with an annual rent of $4,251,687 for the remainder of the nine years on the lease plus the options to renew the lease. On this date to the present time, UTC has been in possession under the terms of the lease.
The issues to be determined in this appeal are whether the value placed on the property by the assessor was excessive, and if so, what is the fair market value of the subject property on October 1, 1995.
The highest and best use of the subject property on the date of revaluation is the starting point in the determination of fair market value. The plaintiff's appraisers, Arnold J. Grant and Dr. William N. Kinnard, were of the opinion that the highest and best use of the subject property as vacant land on October 1, 1995, "would be development for light industrial use by a single user-occupant." (Plaintiffs Exhibit A, CT Page 5380 p. 18.) Grant and Kinnard were of the opinion that the highest and best use of the subject property as improved on October 1, 1995 "was its continued use as an industrial manufacturing-repair-office facility with a single user-occupant." (Plaintiff's Exhibit A, p. 20.)
The defendant's appraisers, Christopher K. Kerin and Ronald B. Glendinning, were of the opinion that the highest and best use of the subject property as vacant "would be to develop the site with a single-tenant industrial facility for use by an owner/user, or pre-leased to a single tenant." (Defendant's Exhibit 10, p. 16.) Kerin and Glendinning were of the opinion that the highest and best use of the subject property as improved on October 1, 1995, "would be for its continued present use as an industrial facility by United Technologies Corporation or some comparable entity taking advantage of the special-purpose improvements in place." (Defendant's Exhibit 10, p. 17.) Kerin and Glendinning commented that the "[c]ontinued present use of the subject property represents the most profitable use of the subject property as improved. This highest and best use conclusion properly reflects the market value contribution of the special-purpose features in the subject property. There is no alternate use to which the subject property could be put which would yield a higher present value indication." (Defendant's Exhibit 10, p. 17.) We agree with this conclusion.
We agree with the appraisers for both sides that the highest and best use of the subject premises as vacant would be to develop the site with a single tenant or owner occupied industrial facility. We also agree that the highest and best use of the subject premises as improved would be for its continued use as an industrial facility as presently used by UTC.
The plaintiffs appraisers, Grant and Kinnard, arrived at their opinion of value by using the market sales approach, the capitalization of income approach and the cost approach. Their final conclusion of the value of the subject property of $13,825,000 was developed from the application of all three approaches to value. Their opinion of value using the market sales or comparable sales approach was $13,825,000. Their opinion of value was $13,800,000 using the income capitalization approach, and $14,100,000 using the cost approach.
Grant and Kinnard selected nine sales that they considered to be comparable to the subject property for the purpose of developing market value. We were not impressed with any of the sales selected by Grant and Kinnard upon which they based their opinion of the value of the subject property.
The subject property was a class A, top of the line building, CT Page 5381 constructed for light industrial use. The sales selected by the plaintiffs appraisers were not even close to being comparable to the subject. Sale one was a 40, 000 square foot building with fourteen foot ceilings and no air conditioning, sold by the Federal Deposit Insurance Corporation to investors on September 28, 1995 for $1,200,000. Sale two was a 100, 000 square foot building located in Windsor, Connecticut, near Blue Hills extension. Forty-eight percent of this building was devoted to office space. Sale three was an old mushroom factory located across the street from the subject property in East Windsor. This building of 277, 3 82 square feet had been vacant for several years prior to sale. Sales four and seven were sales of the same warehouse property in Manchester, in 1995 and 1992. Sale five was a warehouse located in Meriden, and sale eight was a warehouse in Manchester. Sale six was a pre-engineered building constructed in 1978 in Enfield. Grant admitted on cross examination that he would not use the subject property as a storage warehouse. Kinnard was of the opinion that the subject was a limited market property with few potential buyers because of the size and character of the building. The town's appraiser, Glendinning, also agreed that the subject was a limited market property because only a limited number of users would be able to fully exploit the features of the building.
We find that the use of the market sales approach used by Grant and Kinnard to arrive at the fair market value of the subject premises as of October 1, 1995, was not credible. On the contrary, we do find credible the opinions of Kerin and Glendinning that the subject is a limited-market property and that they could find no sales of property at or near the revaluation date that could be considered comparable to the subject. "Buyers of special-purchase properties such as the subject property do not typically rely on the sales comparison approach since no two properties tend to have sufficient comparability not to require excessive adjustment." (Defendant's Exhibit 10, p. 49.) For these reasons, we conclude that the market sales approach to finding the value of this special use property was not a viable approach to use in this case.
Turning to the income approach, General Statutes § 12-63b mandates that when comparable sales do not exist in an assessor's town, the assessor must consider each of the following methods of appraisal in determining the fair market value of commercial income producing property: "(1) Replacement cost less depreciation, plus the market value of the land, (2) the gross income multiplier method as used for similar property and (3) capitalization of net income based on market rent for similar property." General Statutes § 12-63b (a). Section 12-63c
permits the assessor to request verification of actual rental and rental-related income or operating expenses related to the current use of CT Page 5382 such property when the valuation of the property is based on the capitalization of net income. Section 12-63b does not change the basic concept of valuation. The three acceptable methods of property valuation are the cost approach, the capitalization of income approach, and the market sales approach. Four D's, Inc. v. Mattera, 25 Conn. App. 308,315, 594 A.2d 484 (1991). If there are market sales available to develop the market approach, the assessor can justifiably use this approach to value when considering income producing property. However, if there are no comparable sales available in the town where the property is located, as we have in this case, § 12-63b requires the assessor to consider the cost approach and the capitalization of net income approach. In considering the capitalization of net income approach, the assessor must base his or her decision on the development of market rentals. The development of market rentals means that the assessor or the appraiser must develop rents that result from leases of properties that are similar or comparable to the subject property. In considering the development of market rents, § 12-63b (b) requires that the assessor or appraiser look at and take into consideration what the actual rent is for the subject property. In other words, the assessor and appraiser must consider whether the contract rent of the subject represents market rent, below market rent, or above market rent.
In considering the income approach to value, Grant and Kinnard disregarded the existing contract rent between Beckenstein and UTC, which produced a yearly rental income stream of $4,251,687. Grant and Kinnard considered the contract rent to be above market rent because, in their opinion, the rent is reflective of the historical cost of constructing the building. In their opinion, the contract rent was two times higher than the market rent and therefore played no role in determining the fair market value of the subject. Grant and Kinnard instead considered eleven market rents that they considered to be comparable to the subject. Grant and Kinnard placed particular emphasis on rentals one, three and four in their report to arrive at their conclusion that the best indicator of market rent for the subject as of October 1, 1995 was $5.50 per square foot of main building area. Rental one, located in East Windsor, was a 48, 000 square foot building with a five year lease with a five year option with rent from $4.00 to $5.08 per square foot during the terms of the lease. Rental three, also located in East Windsor, was a 30,000 square foot building with Sunbeam Bread as a tenant with a lease for five years and a rental income of $4.00 per square foot. Rental four was a 73, 458 building in Hartford used as a printing plant, in which 58, 766 square feet was used as office space. Rental four was a five year lease at $5.50 per square foot. None of the eleven rentals selected by Grant and Kinnard were, in our finding, comparable in size and use to the subject property. Since the basic premise to finding value using the income approach to value is the determination of comparable market rents CT Page 5383 for similar property, the conclusion of value by Grant and Kinnard cannot be supported by the rentals they have chosen to represent market rent. Market rent means "`the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space.'" (Emphasis omitted.) Heather Lyn LimitedPartnership v. Griswold, 38 Conn. App. 158, 163, 659 A.2d 740 (1995), quoting First Bethel Associates v. Bethel, 231 Conn. 731, 739-40,651 A.2d 1279 (1995). In our view, the rentals used by Grant and Kinnard involved properties with dissimilar sizes and uses to the subject property. The rent from the subject property and the rent from Allied Signal more closely represent the market rent for the subject in both size and use.
Kerin and Glendinning took a different approach to finding value using the income approach. Kerin and Glendinning found it difficult, as in their market sales analysis, to find credible comparable rentals. Kerin and Glendinning found only one rental in Connecticut that they could rely on as truly comparable to the subject. This comparable lease was for a 160, 000 square foot industrial building located in the Cheshire Industrial Park in Cheshire. The building was leased by Allied Signal, which spent $10,000,000 to improve the property with special purpose features suiting its specific needs. Kerin and Glendinning found the effective net rental rate for the Allied Signal property to be $14.06 per square foot. Allied, Signal's lease, like UTC's lease with Beckenstein, provided for an option to purchase by the tenant. When comparing the Allied Signal rental of $14.06 with the contract rent of the subject of $13.70 per square foot, Kerin and Glendinning concluded that the contract rent of the subject was also the market rent for such a property. We agree with Kerin and Glendinning that the Allied Signal lease is the most comparable lease, and we agree with their conclusion that the contract rent for the subject property was also the market rent for the property.
Kerin and Glendinning used the discounted cash flow method of analysis to estimate the value of the subject property. As Kerin and Glendinning noted: "Discounted cash flow analysis is considered to be a very appropriate technique for estimating the market value of the subject property because it is based on the projected cash flow of the property over the holding period. This approach is most reflective of the valuation process a typical buyer utilizes when contemplating the purchase of an income-generating investment property." (Defendant's Exhibit 10, p. 39.) We are impressed with this analysis since we find that the lease between Beckenstein and UTC was made at "arm's length" between two knowledgeable and experienced parties, and a nationally recognized tenant would be responsible for the payment of the rent over the life of the lease. CT Page 5384
Using the discounted cash flow analysis, Kerin and Glendinning found the fair market value via the income approach as follows:
 Present value of mortgage $20,917,954 Present value of the cash flows 3,691,353 Present value of the reversion 6,446,349 ----------- $31,055,656
 Less: Maximum payment to tenant for participation rights as provided for in lease 5,000,000 -----------
Final market value via income approach $26,055,656
(See Defendant's Exhibit 10, p. 48.) We find this analysis by Kerin and Glendinning to be credible.
In considering the cost approach to value, the appraisers for the parties took divergent approaches. Grant and Kinnard considered only the use of Marshall Valuation Service, whereas Kerin and Glendinning used the historical cost and the Marshall Valuation Service to analyze the cost of constructing the subject building.
Grant and Kinnard used a two-step analysis. First, Grant and Kinnard determined the value of the land. To do this, they examined twelve land sales to arrive at their conclusion that the market rate was $25,000 per acre. Multiplying the $25,000 by the subject land's 39.41 acres resulted in a total land value of $985,250 as of October 1, 1995. Kerin and Glendinning arrived at the land value of the subject by analyzing two land sales, 100 Helmsford Way, Windsor and 135 Great Pond Drive, Windsor, which were two of the twelve land sales used by Grant and Kinnard. Kerin and Glendinning arrived at a value of $34,506 per acre for the subject land. Grant and Kinnard were of the opinion that if the subject land had a larger street frontage than its 200 foot frontage on Newberry Road, the subject land could have been priced at $32,000 per acre. We do not consider the 200 foot frontage to be a detriment. The 200 foot frontage provides for a road access from Newberry Road to the interior of the large parcel. It is not the road frontage that is important to the subject as it would be if it were a strip mall, it is the overall use of the land made by UTC that is important. While Grant and Kinnard concluded that Beckenstein overpaid for the subject property because it was entering into a lease with UTC, we find this hard to believe. Beckenstein purchased the 39.41 acres for $1,400,000, or approximately $35,000 per acre, from Henry L. Shensky on November 2, CT Page 5385 1987. Our view of the evidence is that the sale from Shensky to Beckenstein was an arm's length transaction. There is no evidence to conclude that UTC would condone Beckenstein paying more than the market price for the land so that the lease from Beckenstein to UTC could be inflated with this additional cost.
Considering the input from all of the appraisers, and placing more weight on the analysis by Kerin and Glendinning, and more importance on the sale from Shensky to Beckenstein than do the appraisers, even with the passage of time from 1987 to 1995, we conclude that the fair market value of the subject land for the purpose of developing the cost approach, as of October 1, 1995, was $1,400,000.
In the second step under their analysis of the value of the subject property using the cost approach, Grant and Kinnard calculated the replacement cost new of the building and then trended this cost back to October 1, 1995 to arrive at the 1995 value, less physical depreciation. Grant and Kinnard did not find that the building suffered from functional obsolescence. Grant and Kinnard arrived at a total cost new of $16,104,062 through the use of calculated costs based on the Marshall Swift Valuation Service. Grant and Kinnard used the Marshall Valuation Service costs rather that the historical costs of constructing the subject because they felt that the calculated cost service was more representative of construction costs. In addition, Grant and Kinnard did not have sufficient knowledge of the historical costs to be of any benefit to them. Grant and Kinnard concluded that the subject building was in a mixed class of "C" and "5" with quality determined as "good." Using the June 1999 edition of Marshall Valuation Service, Grant and Kinnard concluded that the building cost of the main building and classroom area of the subject as of June 1999 was $51.70 per square foot. Grant and Kinnard estimated the cost of constructing the pump house to be $25.23 per square foot, and the office mezzanine to be $26.16 per square foot, added 5% for coordination of the development project, and concluded that the total replacement cost new of the primary buildings was $15,172,966. (Plaintiffs Exhibit A, p. 46.) Grant and Kinnard added $836,800 for paving, $30,000 for landscaping, $67,500 for fencing and $4000 for light standards to arrive at a total replacement cost new of $16,111,266. Grant and Kinnard then trended back the June 1999 figure to October 1, 1995 using the adjustment factor in Marshall Valuation Service to arrive at a replacement cost new as of October 1, 1995 of $15,118,812. Grant and Kinnard next considered the effect of accrued depreciation on the subject. Grant and Kinnard estimated the effective age of the subject to be 5 years as of October 1, 1995. Grant and Kinnard found no functional or external obsolescence, but did estimate physical depreciation by applying 2.5% per year on a declining, negative compound interest basis to arrive at $1,994,228 for depreciation of the CT Page 5386 buildings. Grant and Kinnard also applied a 35% depreciation factor to paving, fencing and light standards to arrive at a total depreciation for site improvements of $299,864. The total accrued depreciation, therefore, amounted to $1,994,223. By subtracting the accrued depreciation of $1,994,223 from the replacement cost new of $15,118,812, Grant and Kinnard arrived at a fair market value of the building of $13,124,589. To this figure, Grant and Kinnard added the fair market value of the land of $985,250 to reach their conclusion that the fair market value of the subject property using the cost approach was $14,109,839, rounded to $14,100,000, as of October 1, 1995. (See Plaintiffs Exhibit A, pp. 48-50.)
Kerin and Glendinning developed final cost estimates using two processes, the historical cost analysis, and the replacement cost estimates provided by Marshall Valuation Service. Using the historical cost method, Kerin and Glendinning looked at the actual historic costs to construct the subject building in 1988. These costs were obtained from UTC and amounted to $18,775,296. Kerin and Glendinning used the Comparative Cost Multipliers provided in the Marshall Valuation Service to trend the construction costs to October 1, 1995. Kerin and Glendinning multiplied the 1988 construction costs by 10.7%, the cost trend factor developed from Marshall Valuation Service to arrive at construction costs as of October 1, 1995, of $20,784,253. Kerin and Glendinning also used the Marshall Valuation Service figures in determining value under the cost approach. Using the Marshall Valuation Service, Kerin and Glendinning arrived at a replacement cost new of $20,605,564. As Kerin and Glendinning noted, the cost estimation provided by the Marshall Valuation Service is a more generalized approach to value than using the actual costs of construction under the historical cost approach. The credibility of developing value using the Marshall Valuation Service in this case is put in question when we have four appraisers with impeccable credentials who use the same valuation service to arrive at values that are $6,000,000 apart. We find that the historical cost approach used by Kerin and Glendinning is the more credible way to arrive at value, since the actual construction costs of the subject property were available. "This method of estimating cost is deemed very reliable as it is based on the actual costs to construct the subject improvements through a breakdown of all the major building components, which results in an accurate cost estimate." (Defendant's Exhibit 10, p. 28.) We note in this case that Kerin and Glendinning added an entrepreneurial profit of 15% of $20,780,000 to the direct construction costs. We disagree with this addition because the lease arrangement between Beckenstein and UTC appears to incorporate any entrepreneurial profit in the rent. We find the historical cost approach as utilized by Kerin and Glendinning, is the more credible cost approach, except for their addition of the entrepreneurial profit and our finding, as stated above, that the land CT Page 5387 value was $1,400,000. Accordingly, we adopt the historical cost approach of Kerin and Glendinning as follows:
 Cost of new improvements (historical, rounded) $20,780,000 Less depreciation 623,400
Depreciated value of improvements $20,156,600
 Value contribution of tenant improvements 1,080,000 Land value (the court's finding of value) 1,400,000
Final market value via cost approach $22,636,600
Our finding of fair market value of $22,636,600 using the historical cost approach is compatible with the finding of fair market value of John J. Valente, who appraised the property for East Windsor for its revaluation of October 1, 1995. Valente arrived at a value of $22,236,770, which was adopted by the East Windsor assessor as the value of the subject property for tax purposes on the list of October 1, 1995.
In summary, we have a top of the line, class A building constructed in 1988 for the needs of a specific tenant, who entered into a long term lease with the owner to pay $4,251,687 per year on a qualified triple net lease covering the remaining nine years of the lease with options to extend for two additional ten year periods. "`[T]he taxpayer bears the burden of establishing that the assessor has overassessed its property. . . . The trier of fact must arrive at his own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value.' (Citations omitted; internal quotation marks omitted.)" Ireland v. Town of Wethersfield, 242 Conn. 550, 556-57,698 A.2d 888 (1997), quoting Xerox Corp. v. Board of Tax Review,240 Conn. 192, 204, 690 A.2d 389 (1997). We find, based upon all the factors discussed in this opinion, as well as our analysis of the appraisers' efforts in determining valuation and our own knowledge regarding values, that the subject property was not overassessed by the assessor on the October 1, 1995 grand list. Accordingly, we find that UTC has not met its burden of showing that the property was overvalued.
Accordingly, judgment is entered in favor of the defendant. UTC's appeal is dismissed, without costs to either party.
 Arnold W. Aronson Judge Trial Referee
CT Page 5388